# EXHIBIT A

## SELECTED ADVERSE EVENTS AND SYSTEMIC MISCONDUCT

These actions are part of a broader pattern in which internal legal and administrative units collaborate to suppress protected activity and insulate unlawful employment decisions from scrutiny. Plaintiff's experience mirrors and amplifies the institutional failures described in *In re OPM Mass Termination* and reveals the same structural abuse under a different but directly connected factual sequence.

Plaintiff, a Chinese-American federal employee with advanced academic qualifications (Ph.D., full professor), alleges a pattern of adverse actions and procedural misconduct carried out during and under the same institutional restructuring mechanisms challenged in *In re OPM Mass Termination*. Key events include:

**I. Selected Adverse Events and Systemic Misconduct**

**May 2023**

Plaintiff was reassigned during a structural reorganization allegedly influenced by ethnicity. A senior decision-maker repeatedly told her to "go back to Chinese school"—an admission recorded in the ROI.

- *Comparator A*: A Caucasian male peer received a first-choice reassignment without demonstrated proficiency in the assigned language.
- *Discriminatory Workload Assignment*: Plaintiff was assigned a full Chinese teaching load in addition to Student Learning duties without compensation.
- *Comparator B*: Similarly qualified male colleagues were not subjected to comparable double workloads.

**June 2023**

- Plaintiff was rejected for the Assessment Specialist position in ETD, while Comparator A (less qualified) was selected.
- Plaintiff initiated EEO contact and filed a formal complaint alleging race, national origin, and sex discrimination.
- Shortly after her filing, Plaintiff was rejected for the ODA Specialist position. The selectee lacked technical experience and academic qualifications.

**May 2024**

Plaintiff was again denied the Assistant Immersion Coordinator position, despite documented success managing immersion programs.

**October 2024**

Plaintiff filed a Motion for Summary Judgment before the EEOC. Agency counsel responded with delay tactics and internal disparagement, expressing "losing patience" with Plaintiff's filings.

**December 2024**

Plaintiff was again denied the Academic Specialist position for UML, following a publicly humiliating interview process.

Around the same time, the Associate Provost forwarded Plaintiff's confidential work communication to Legal Counsel within one minute of receipt. Legal Counsel subsequently circulated internal instructions to "mitigate against her mechanism"—a violation of confidentiality standards that created a chilling effect.

**January 2025**

Plaintiff's name was removed from the quarterly awards list despite prior nomination and eligibility, without explanation.

**February 2025**

- Plaintiff received unsolicited, privileged material from Agency Legal Counsel, copied to senior leadership, under circumstances suggesting retaliatory intent.
- Discovery disclosures showed signs of tampering with TDA records, consistent with broader systemic misconduct challenged in *OPM* litigation.

**April 2025**

- The EEO Director declined to investigate the disclosure incident and refused to interview Agency Counsel.
- The Inspector General issued a legal disclaimer—without prior complaint—echoing Agency Counsel's defenses, further eroding neutral oversight.

**Spring 2025**

- Senior leadership issued mass communications acknowledging the existence of retaliatory culture and systemic procedural dysfunction, without implementing corrective actions.
- After submitting her DPMAP inputs timely, Plaintiff was unexpectedly instructed to resend data to her prior supervisor, who had previously downgraded her ratings after EEO activity. No formal rater change was communicated.
- These deviations from standard procedures raise concern of retaliation, evaluation manipulation, and suppression of protected rights.

Plaintiff's experience exemplifies how internal legal and administrative units collaborated to isolate, suppress, and penalize protected activity—mirroring the institutional breakdown and systemic abuses underpinning the *In re OPM Mass Termination* litigation.

**II. Due Process Violations (Fifth Amendment)**

**1. Protected Property and Liberty Interests**

Plaintiff possessed constitutionally protected property interests in continued career advancement, eligibility for promotion, and federal employment status, as well as liberty interests in maintaining her professional reputation and avoiding career-stigmatizing adverse actions.

(Authority: *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 569–70 (1972)).

**2. Legitimate Claim of Entitlement Based on Federal Structures**

Through the agency's formal merit promotion system, DPMAP evaluations, federal anti-discrimination statutes, and internal award nomination processes, Plaintiff reasonably relied on rules and mutually explicit understandings that created a legitimate entitlement to fair, merit-based career advancement.

(Authority: *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)).

**3. Destruction of Induced Reliance — Government Bait-and-Switch**

Defendant first rewarded Plaintiff's performance and then, after EEO engagement, deliberately reassigned, downgraded, and excluded her — effectively weaponizing formal employment mechanisms against her in violation of constitutional guarantees. This constitutes an unconstitutional bait-and-switch undermining federal employment integrity.

(Parallel Argument: *Goldberg v. Kelly*, 397 U.S. 254 (1970)).

**4. Procedural Defects and Pretextual Justifications**

The agency's adverse actions — including reassignment without individual assessment, denial of promotion despite objective merit, tampered records, and suppressed witness testimony — lacked fair notice, neutral evaluation, or meaningful opportunity to contest, violating Plaintiff's due process rights.

**5. Continuing and Irreparable Harm**

Plaintiff's career trajectory, future earning capacity, retirement eligibility, and professional reputation continue to be impaired daily, presenting irreparable harm that monetary damages cannot alone redress.

**II. Equal Protection Violations (Fifth Amendment)**

**1. Protected Class Membership and Heightened Scrutiny**

Plaintiff is a Chinese-American, foreign-born woman employed in a federal agency. Adverse personnel actions affecting her implicate race, national origin, and gender discrimination, requiring heightened judicial scrutiny.

(Authority: *United States v. Windsor*, 133 S. Ct. 2675 (2013); *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

**2. Discriminatory Intent Inferred from Departure from Norms**

Sudden reassignment without individualized justification, selective removal from promotion opportunities, blacklisting from awards, and tampering with records all reflect significant departures from standard agency practices — circumstantial evidence of discriminatory animus under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977).

**3. Disparate Impact on Chinese Faculty and Protected Groups**

The agency's prolonged freeze on hiring for Chinese language programs — while leaving them critically understaffed — alongside Plaintiff's overburdening and career suppression, disproportionately impacted Chinese-American staff and reveals discriminatory impact along national origin lines.

**4. Institutional Climate of Retaliation and Discrimination**

DLI's admission of over 100 EEO complaints and acknowledged retaliatory culture by senior leadership, without corrective measures, reinforces the historical background of systemic discrimination relevant under Arlington Heights standards.

**5. Procedural Irregularities Following Protected Activity**

The exclusion of key witnesses, refusal to correct records, strategic blacklisting, and escalation after Plaintiff's protected activity collectively create a strong inference that Plaintiff's race, national origin, and protected EEO status motivated Defendant's adverse actions.