**UNITED STATES FEDERAL COURT NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Hang Zhang,**<br>*Plaintiff,*<br><br>VERSUS<br><br>**DANIEL DRISCOLL,**<br>**Secretary, Department of the Army,**<br>*Agency.* | **Case No.: 25-cv-03381**<br><br>**COMPLAINT FOR DISCRIMINATION, RETALIATION, HOSTILE WORK ENVIRONMENT, AND CONSTITUTIONAL VIOLATIONS**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DISCRIMINATION, RETALIATION, HOSTILE WORK ENVIRONMENT, AND CONSTITUTIONAL VIOLATIONS**

When a federal agency could not defend its discrimination, it retaliated. As retaliation exposed widespread leadership misconduct and serious fraud, Defendant moved to terminate a hardworking minority female professor with an impeccable 23-year record.

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................5

II.     JURISDICTION, VENUE, AND PARTIES ........................................6

III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES ....................6

IV.      FACTUAL ALLEGATIONS (TIMELINE) ......................................6

A.  Defendant told Dr. Zhang to "go back to Chinese school" and singled her out for double workload
B.  Defendant denied Dr. Zhang seven qualified positions and downgraded her appraisal after her EEO filing
C.  Defendant obstructed EEOC proceedings and Agency Counsel urged senior leaders to "disseminate her EEO status"
D.  Defendant escalated retaliation while shielding white male colleague's misconduct
E.  Defendant Exposed Dr. Zhang's Whistleblower Activity, Preparing for Her Removal

V.      CLAIMS FOR RELIEF ...............................................................13

        Count I – Disparate Treatment (Title VII)

        Count II – Retaliation (Title VII)

        Count III – Hostile Work Environment (Title VII)

        Count IV – Equal Pay Act

        Count V –  Fifth Amendment Due Process

        Count VI – First Amendment Retaliation

        Count VII – Privacy Act

        Summary of Harms

VI. PRAYER FOR RELIEF ........................................................24

Table of Authorities

Cases

Axon Enterprise, Inc. v. Federal Trade Commission, 598 U.S. 175 (2023) ...............20

Board of Regents v. Roth, 408 U.S. 564 (1972) ...........................................................19

Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006)...........16

Corning Glass Works v. Brennan, 417 U.S. 188 (1974) ..............................................19

Garcetti v. Ceballos, 547 U.S. 410 (2006) .................................................... .....................21

Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993) ....................................................18

Jensen v. Brown (9th Cir. 2025) ....................................................................................21

Mathews v. Eldridge, 424 U.S. 319 (1976) ..................................................................20

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .........................................15

Pickering v. Board of Education, 391 U.S. 563 (1968) ................................................21

1
2
3
4
5

Statutes

6  U.S. Constitution, First Amendment

7  U.S. Constitution, Fifth Amendment

8  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

9
10  Equal Pay Act of 1963, 29 U.S.C. § 206(d)

11  Privacy Act of 1974, 5 U.S.C. § 552a

12  28 U.S.C. § 1331 (federal question jurisdiction)

13  28 U.S.C. § 1343(a)(3)-(4) (civil rights jurisdiction)

14
15  28 U.S.C. § 1391 (venue)

16  42 U.S.C. § 2000e-5(f)(3) (Title VII enforcement)

17  42 U.S.C. § 2000e-5(k) (Title VII attorney's fees)

18
19
20  Regulations

21  29 C.F.R. § 1614.108(b) (confidentiality protections)

22
23  5 C.F.R. Part 432 (removal procedures)

24
25
26
27
28

4

# I. INTRODUCTION

1. Plaintiff, Dr. Hang Zhang ("Dr. Zhang" or Plaintiff),  brings this action under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e et seq.), and under the Fifth Amendment to the United States Constitution for employment discrimination based on race (Chinese), sex (female), national origin (P. R. China), retaliation for engaging in protected EEO and whistleblowing activities, and for violations of Due Process and Free Speech, in addition to EPA and Privacy Act violations.

2. Plaintiff was subjected to a hostile work environment created and sustained by high-level agency officials, including Agency Counsel and the Chief of Staff, who coordinated to undermine her protected activity and obstruct her access to a fair resolution process.

3. After Dr. Zhang reported disparate treatment, Defendant reassigned, isolated, and retaliated against her using the full weight of its institutional power. The retaliation escalated in phases, revealing a systemic pattern of discrimination and reprisal:

   o **Phase 1 (2023–2024):** The Associate Provost and Deans forced Dr. Zhang into improper reassignments, doubled her workload, and repeatedly blocked her from qualified positions.

   o **Phase 2 (late 2024–early 2025):** After Dr. Zhang filed with the EEOC, Agency Counsel and senior leadership orchestrated retaliation—circulating written threats, chilling protected activity, and sabotaging her attempt to resolve the matter through mediation.

   o **Phase 3 (mid–2025-present):** When Dr. Zhang exposed fraud harming students, the Chief of Staff retaliated instantly by revealing her whistleblower status to her supervisors and leadership. Defendant then issued the first-ever counseling letter in her 23-year career threatening termination, stripped her core duties, launched sham investigations, and coordinated her removal.

4. Each phase intensified the harm and demonstrated a continuing hostile work environment. Discrimination and retaliation are not separate threads—the retaliation itself

is the intensification of discrimination. Defendant continues to put Dr. Zhang's federal career, safety, and professional standing at immediate risk.

5. Plaintiff seeks declaratory and injunctive relief, compensatory damages, attorneys' fees, and any other relief deemed appropriate by this Court.

## II. JURISDICTION, VENUE AND PARTIES

6. This Court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

7. Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices occurred in this District.

8. Plaintiff Hang Zhang is a civilian federal employee formerly or currently assigned to the Defense Language Institute Foreign Language Center (DLIFLC).

9. Defendant Daniel Driscoll is the Secretary of the Army and is sued in his official capacity. The Department of the Army is Plaintiff's employer within the meaning of Title VII.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff timely initiated EEO counseling and filed a formal complaint of discrimination on June 13, 2023 and filed with EEOC on February 23, 2024. The 180-day investigative period has passed without a final decision, allowing Plaintiff to file this action.

11. Plaintiff has also filed a timely amendment to the formal complaint to incorporate related claims of post-filing retaliation and procedural misconduct, which are like or related to the initial claims.

To the extent administrative remedies were required and not exhausted as to any act or theory stated herein, Plaintiff expressly invokes all applicable equitable doctrines, including but not limited to equitable tolling, estoppel, waiver, and the continuing violation doctrine.

**TIMELINE**

12. Dr. Zhang, a Chinese American female who holds a Ph.D. from University of Illinois (Linguistics, 2003), started working at the Agency in 2002.

13. In 2018, Dr. Zhang interviewed for the Student Learning Specialist (SLS) position and was formally selected through a competitive process. She worked under Faculty Development (FD) under ETD (Education Technology Directorate). The SLS taught preparatory modules in English to new students, not target language instruction.

14. Dr. Zhang's personnel file contains commendations for curriculum development, student outcomes, and teaching excellence, with no prior disciplinary actions in 23 years of federal service and consistently received "Exceeds Expectations" or higher performance ratings.

**A. Defendant told Dr. Zhang to "go back to Chinese school" and singled her out for double workload**

15. 2006-2023 – Senior leadership, including former Commandant, former Provost, and former Chief, publicly made remarks, including referring to female faculty as a 'stable of teachers' and admitting 'all leaders here are old white male.' These remarks establish the discriminatory environment.

16. Prior to May 5, 2023 – Senior DLI leadership of reorganization, including Dr. Rama Munajat (Dean of UKP), repeatedly told Dr. Zhang to "go back to Chinese school" based on her ethnicity, national origin, and gender, a de facto demotion erasing her SLS expertise and hard work. She refused.

17. May 5, 2023 – Associate Provost ("AP"), Dr. Jonathan Gajdos, forcefully reassigned Dr. Zhang to the Chinese/Russian school against her three requests while granting a white male colleague, Mr. Michael Gelbman, his first choice.

18. May 5, 2023 – White male colleague, Dr. Timothy Berndt, with comparable Chinese language capability, retained his preferred Faculty Development assignment and was never assigned Chinese teaching responsibilities.

19. May 5, 2023 – AP did not reassign another male colleague with language teaching capacity to his target language school either.

20. May 5, 2023 – AP claimed in sworn testimony (March 2024) he relied on TDA data and Mr. Gelbman's Spanish proficiency for his assignment, but TDA shows no Spanish

designation nor was Mr. Gelbman required to teach full-time Spanish in his new school UML.

21. May 5, 2023 – AP stated in ROI testimony that Dr. Zhang was reassigned to the Chinese Russian School based on her language expertise. No one else in the cohort was assigned using the same language-matching criteria.

22. June 4, 2023 – Dr. Zhang official post formally changed to the Chinese Russian school with 10 to 15 hours Chinese teaching written in her performance standards on top of her own SLS job.

23. May 5, 2023 – The only other specialist required to perform additional full-time Chinese teaching was another Chinese female full professor, showing that Chinese women (and other minority females) were targeted.

24. On or around May 5, 2023 – Dr. Zhang contacted local EEO office. The case officer acknowledged that assigning Dr. Zhang to teach Chinese all day on top of her SLS job suggested potential discrimination.

25. May, 2023 – The Inspector General's military representative encouraged filing, but the next day the IG Director abruptly denied the complaint.

26. May 11, 2023 – Dr. Zhang formally requested an EEO appointment via email.

27. June 4, 2023 – Former Supervisor showed the only other specialist required to perform additional full-time Chinese teaching was another Chinese female full professor, showing that Chinese women (and other minority females) were uniquely targeted.

28. June 13, 2023 – The Union rejected negotiation on behalf of Dr. Zhang and failed to represent her thereafter, depriving her of procedural protection.

**B. Defendant denied Dr. Zhang seven qualified positions and downgraded her appraisal after her EEO filing**

29. June 4, 2023 – **First job denial** – Defendant rejected Dr. Zhang for Test Specialist position. The selectee, Mr. Michael Gelbman, lacked a Ph.D., Assistant Professor, and direct experience with Assessment and ILR. He had been previously selected for Academic Specialist role" before being chosen over Dr. Zhang.

8

30. June 14, 2023 – **Second job denial** – One day after filing EEO complaint, Dr. Zhang was rejected for ODA position at ETD despite holding a Ph.D. and specific ODA experience. The selectee lacked a Ph.D. and direct ODA technical experience.

31. June 16, 2023 – **Third job denial** – Defendant rejected Dr. Zhang for Operations Research Analyst position despite holding a Ph.D. in the relevant field and strong research background.

32. March 4, 2024 – A DoD Investigator removed top leaders (former Commandant, Provost, and former Chief of Staff) from the witness list without explanation.

*33.* March 4, 2024 -During sworn testimony (recorded in ROI), AP admitted discriminatory intent: "it doesn't mean I don't see that is discriminatory."

34. March 4, 2024 -Dr. Rama Munajat admitted to the "go back to Chinese school" statement in sworn testimony

35. March 4, 2024 -AP proposed after his live interview to the DoD investigator to submit the TDA (Table of Distribution and Allowance) as the basis of his reassignment decisions, almost a year into the complaint.

36. April, 2024 – Her former supervisor, Ms. Marinela Cyriacks and former dean, Dr. Victorya Shevchenko of UCR, both with explicit knowledge of Dr. Zhang EEO activity, downgraded Dr. Zhang's ratings after her signature and denied her step increase (Dr. Zhang signed in good faith and discovered this procedural irregularity around April 2025).

37. April 24, 2024 – Defendants improperly submitted confidential mediation communications as evidence to the agency investigator, who then published and widely circulated them, in violation of federal mediation confidentiality protections.

38. May 13, 2024 – **Fourth job denial** – Defendant denied Dr. Zhang for Assistant Director of Immersion despite her superior credentials and substantial experience with immersions and DTS.

**C. Defendant obstructed EEOC proceedings and Agency Counsel urged senior leaders to "disseminate her EEO status"**

39. August 13, 2024 – In an EEOC initial conference, the Administrative Judge stated reorganization is not a defense and permitted the Equal Pay Act (EPA) claim to proceed.

40. October 15, 2024 – Dr. Zhang filed a Motion for Summary Judgment with the EEOC and stated her reassignment was not merit-based and violated Command policy.

41. October - December, 2024 – Agency Counsel caused multiple discovery delays, canceled mediation meeting last minute, stated no witnesses could be identified, and stated she was "losing patience" with Dr. Zhang's "onslaught of motions."

42. November 20, 2024 – Dr. Zhang interviewed for Academic Specialist at UML. During the interview, Dean of Students, Lt. Col. Jorge publicly dismissed Dr. Zhang and undermined her credibility, signaling to panelists that she should not be selected.

43. November 22, 2024 – Dr. Zhang, in good faith, complained exclusively through the military chain of command to the Commandant and (former) Assistant Commandant. A Lt. Col. apologized and offered discussion but copied AP.

44. November 27, 2024 – Dr. Zhang replied to the Lt. Col., requesting a written implementation plan for the Commandant's Policy before further discussion. No response.

45. December 10, 2024 – **Fifth job denial** – Defendant rejected Dr. Zhang for Academic Specialist position at UML. Lt. Col. Jorge and AP oversaw this selection process and selected a candidate half of her experience and one academic rank lower.

46. December 31, 2024, at 14:32. – Dr. Zhang sent a professional inquiry to Lt. Col. Jorge regarding strategic planning initiatives. No response.

47. December 31, 2024, at 14:33, within one minute, AP, despite on leave, forwarded Dr. Zhang's email to Agency Counsel.

48. December 31, 2024, at 14:52, Counsel sent a coordination directive to senior leadership characterizing Dr. Zhang's inquiry as part of her EEO "mechanisms" to be mitigated and instructed officials to "disseminate" Dr. Zhang's protected EEO activity. The coordinated institutional retaliation shows unlawful motive and escalation.

49. January 11, 2025 – Dr. Zhang filed an Amendment on Retaliation to her MSJ against Counsel's misconduct. The EEOC judge provided no acknowledgement until February 2025

50. January 15, 2025 - The Commandant, Col. Christy Whitfield ("Commandant"), publicly acknowledged lack of transparency in chair selection processes and contained procedural irregularities affecting personnel decisions.

51. January 16, 2025 – Agency Counsel stated that recipients of her December 31, 2024 email "are likely to be called as witnesses."

52. January 17, 2025 – Counsel was placed on sudden two-week medical leave. The Supervisory Attorney stated he had been "assigned unexpectedly" to the case.

53. In and around January, 2025 – The Chief of Staff, Mr. Mark McLoed ("Chief"), stated publicly that the agency "can write its own rules" with "not much regulation from above," evidencing institutional disregard for due process requirements. In the same interview, he spoke in terms that stereotyped certain races.

54. January 23, 2025 – Dr. Zhang reported Counsel's misconduct to EEO.

55. January 30, 2025 – Supervisor, Academic Specialist, Dr. Yali Chen ("Supervisor"), met with white male comparator for key workplace discussions on SLS issues and excluded Dr. Zhang.

56. January 30, 2025 – Defendant rescinded Dr. Zhang's quarterly award after public listing and removed her from the ceremony, a serious punishment and stigmatization in a military institute. No similarly situated white male employee experienced comparable treatment.

57. February 7, 2025 – Counsel was reinstated without notice and emailed Dr. Zhang unsolicited privileged disclosure in violation of confidentiality, exposing her to risk and disrupting her work.

58. February 8, 2025 – Dr. Zhang protested via email the unlawful exposure to the Supervisory Attorney and EEOC judge. No response.

59. February 16, 2025 – Dr. Zhang reported Counsel's unauthorized disclosure to EEO.

60. February 27, 2025 – Dr. Zhang reported Counsel's misconducts to IG.

61. April 1st, 2025 –EEO emailed refusal to investigate counsel's misconducts, parroting Counsel's own excuses.

62. April 1, 2025 – IG emailed refusal to investigate counsel's misconducts, parroting Counsel's own excuses.

63. February 21, 2025 – Defendants omitted and doctored language designations of Caucasian male comparators and other relevant personnel in TDA file, contradicting AP's ROI testimony and showing manipulation.

64. February 21, 2025 – Defendant engaged in procedural misconduct, failed to complete document production for over four months without extension, cancelling mediations and obstructing resolution.

65. March 6, 2025 – Defendant recalled this position after the selectee retracted acceptance without interviewing top candidates, making these personnel movements highly irregular.

66. March 14, 2025 - **the sixth job denial** – Defendant rejected Dr. Zhang via email for the Assessment Specialist position at LPAD.

67. Ongoing - Jonas Smith (pseudonym), no Ph.D. and ranks one level lower, was selected for institutional meetings and representation opportunities while being shielded from accountability for documented student harm.

**April–July 2025**

**D. Defendant escalated retaliation while shielding white male colleague's misconduct**

68. April 2025, Dr. Zhang raised concerns in good faith about appraisal irregularities. Dean of URU Dr. Iknur Oded ("Dean) and AP retaliated by assigning additional duties without credit.

69. Supervisors erased or denied evidence of the colleague's duplicated reports, shielding him from accountability.

70. Supervisor ordered meetings for anonymous "chair requests" while refusing to put it in writing.

71. June-July 2025, Supervisor doubled her workload by ordering her to cover a white male colleague's backlog, whose duplicated advising reports have been harming students.

72. Dean initially acknowledged the duplicated report issues but subsequently accused Dr. Zhang of making "unfounded allegations" and publicly labeled her "unethical" despite earlier acknowledgement of the underlying issue.

73. Inspector General forced Dr. Zhang into 47-question interrogatory sets and rejected her fraud complaint harming students and wasting government resources.

74. AP denied Dr. Zhang credit for institutional innovations and condoned this misconduct harming students without investigation.

**August–September 2025**

**E. Defendant Exposed Dr. Zhang's Whistleblower Activity, Preparing for Her Removal**

75. Dr. Zhang reported student concerns to Chief of Staff. Within 20 minutes, Chief exposed her confidential whistleblower status to Dean and AP while refusing to investigate the reported misconduct. Retaliation immediately escalated.

76. The next day, Dean prohibited Dr. Zhang from maintaining normal student contact despite military endorsement.

77. Deputy Dean initiated a sham investigation based on a single anonymous comment.

78. Supervisor issued the first counseling letter of her 23-year career, explicitly threatening removal.

79. Defendant denied Dr. Zhang a **seventh qualified** position as Institutional Evaluator (continuing pattern).

80. DoD investigators forced her into a 148-page interrogatory with 72-hour deadlines and canceled live testimony.

81. Supervisors escalated harassment with excessive reporting demands and repeated meetings, openly preparing removal under 5 C.F.R. Part 432

82. Dr. Zhang elevated the fraud and misconduct to the Commandant but received no response.

**V. CLAIMS FOR RELIEF**

**COUNT I – DISPARATE TREATMENT ON THE BASIS OF SEX, RACE, AND NATIONAL ORIGIN UNDER TITLE VII (42 U.S.C. § 2000e-2)**

83. Plaintiff incorporates by reference preceding paragraphs as if fully set forth herein.

84. Plaintiff is a Chinese American female with a Ph.D. in Linguistics, a member of multiple protected classes under Title VII, and has consistently received praise for her teaching, research, and student outcomes, and was fully qualified for all positions at issue.

85. Defendant subjected Plaintiff to a pattern of adverse employment actions because of her protected status, including seven denials of qualified positions, often in favor of less qualified white male comparators, imposition of a dual teaching workload not required of similarly situated males, exclusion from institutional roles, and public and private disparagement, including being labeled "unethical" by the Dean for reporting institutional fraud.

86. Most significantly, senior leadership repeatedly told Plaintiff to "go back to Chinese school," providing direct evidence of racial and national origin animus.

87. Throughout 2023–2024, white male comparators were treated more favorably in workload, promotions, and assignments, despite lesser qualifications. Dr. Timothy Berndt (Faculty Development Specialist, Chinese language capability, no dual roles), Mr. Michael Gelbman (same cohort of SLS during reassignment, no Ph.D., two academic ranks lower, granted first choice in reassignment and promoted despite lower qualifications), and Jonas Smith (faculty peer, same job title, no Ph.D., one academic rank lower, selected for meetings/representation, shielded from accountability). Each was treated more favorably than Plaintiff in assignments, promotions, workload, and discipline, despite Plaintiff's superior qualifications and performance.

88. Direct evidence of discriminatory motive: Senior leadership made repeated discriminatory remarks, including referring to female faculty as "a stable of teachers," stereotyping other races as overly emotional, and admitting that "all leaders at DLI are white male." In sworn testimony, leaders admitted discrimination "could not be ruled

out." The December 31, 2024, email directive provides direct evidence of institutional coordination to "mitigate" Plaintiff's EEO activity.

89. Defendant's shifting explanations for these decisions (e.g., teacher shortage, student preference, TDA data) were inconsistent and pretextual. Defendant refused to produce selection matrices or interview records and took no corrective action despite documented misconduct.

90. This pattern of adverse treatment, unique overburdening of Chinese female faculty, and preferential treatment of less qualified white male comparators demonstrates systemic disparate treatment in violation of Title VII.

91. Under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) framework, this evidence establishes a prima facie case of disparate treatment and demonstrates that Defendant's explanations were pretextual.

92. Plaintiff has satisfied administrative exhaustion for all claims pleaded except marked (&).

93. This claim is reinforced by EEOC judge guidance in Sept.–Oct. 2024, which held that reorganization is not a defense to discrimination.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, damages, and such other relief as the Court deems just and proper.

**COUNT II – RETALIATION UNDER TITLE VII**

(42 U.S.C. § 2000e-3(a))

94. Plaintiff incorporates by reference the relevant factual allegations in the preceding paragraphs as if fully set forth herein.

95. Plaintiff engaged in protected activity under Title VII beginning May 11, 2023, by filing formal EEO complaints (June 13, 2023; February 23, 2024), opposing discriminatory practices, and reporting fraud affecting federal programs. Each act of protected activity was followed, often within days, by adverse employment actions.

96. Defendant had actual knowledge of Plaintiff's protected activity through systematic institutional monitoring, as revealed by multiple evidence and exposed by the December 31, 2024 smoking gun email in which agency counsel explicitly circulated Plaintiff's

EEO status to senior leaders, characterizing her filings as disruptive "mechanisms" requiring institutional "mitigation."

97. Following Plaintiff's protected activity, Defendant subjected her to materially adverse employment actions under *Burlington Northern Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), that would deter a reasonable employee from engaging in protected activity, including:

- o Position denials: Denial of seven qualified positions between June 2023 and March 2025, often with less qualified white male candidates selected despite Plaintiff's superior qualifications.

- o Award rescission: Rescission of quarterly award in January 2025 despite documented excellence

- o Professional isolation: Exclusion from meetings and institutional decision-making processes

- o Performance manipulation: Downgrading of ratings after Plaintiff's signature and creation of pretextual justifications

- o Disciplinary escalation: First counseling letter in 23 years of service containing explicit removal threats.

98. The causal connection is established through temporal proximity (position denial within 24 hours of EEO filing), direct evidence of retaliatory coordination (December 31, 2024 email), and systematic targeting not applied to non-EEO participants.

99. Defendant's shifting explanations (e.g. teacher shortage, TDA reliance) and procedural manipulations, including delayed document production and witness removal, demonstrate that stated reasons were pretextual covers for retaliation.

100.    This pattern of systematic exclusion and adverse treatment was designed to punish Plaintiff's protected activity and deter future complaints, in violation of Title VII's anti-retaliation provisions.

101.    The coordinated institutional response among multiple officials with knowledge of Plaintiff's protected activity supports liability under established precedent.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, damages, and such other relief as the Court deems just and proper.

**COUNT III – HOSTILE WORK ENVIRONMENT**

102. Plaintiff incorporates by reference the relevant factual allegations in the preceding paragraphs as if fully set forth herein.

103. Plaintiff is a Chinese-American female who was subjected to unwelcome conduct based on her sex, race, and national origin that was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment.

104. The hostile conduct included discriminatory remarks and treatment:

- Racial and ethnic targeting: Senior leadership repeatedly instructed Plaintiff to "go back to Chinese school" based on her national origin and ethnicity
- Gender-based disparagement: Leadership referred to female faculty as "a stable of teachers" and made stereotypical comments about women and minorities
- Public humiliation: Dean publicly labeled Plaintiff "unethical" without basis after she reported institutional misconduct

105. The harassment escalated systematically from 2023 through 2025, including:

- Professional isolation: Systematic exclusion from meetings, communications, and institutional decision-making processes
- Discriminatory work assignments: Forced dual teaching load not imposed on similarly situated male colleagues
- Reputational attacks: Public and private disparagement designed to undermine Plaintiff's professional standing
- Award rescission: Removal of earned recognition creating stigmatization among peers

106. By contrast, white male colleagues such as Jonas Smith were shielded from accountability for documented misconduct and received favorable treatment, demonstrating that the hostile treatment was based on Plaintiff's protected characteristics.

107. The conduct culminated in tangible employment actions, including disciplinary measures and explicit removal threats in Plaintiff's first counseling letter in 23 years of service.

108. This pattern of harassment was both subjectively and objectively hostile under Harris v. Forklift Systems. Plaintiff contemporaneously reported the conduct to supervisors and EEO officials, and a reasonable person in Plaintiff's circumstances would find the environment abusive.

109. As a direct result of this hostile environment, Plaintiff has suffered significant psychological distress and physical manifestations of stress.

110. The conduct is imputable to Defendant because it was perpetrated by supervisors with authority over Plaintiff and resulted in tangible adverse employment actions.

111. Defendant's proffered reasons for the hostile treatment shifted and were inconsistent, further supporting that the conduct was pretextual and discriminatory.

112. The harassment was directly tied to Plaintiff's protected characteristics and her engagement in protected EEO activity. This abuse altered the conditions of Plaintiff's employment and was severe and pervasive, creating an atmosphere designed to intimidate and force her resignation.

113. Defendant is liable without affirmative defense because supervisory harassment resulted in tangible employment actions.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, damages, and such other relief as the Court deems just and proper.

## COUNT IV – EQUAL PAY ACT VIOLATION (29 U.S.C. § 206(d))

114. Plaintiff incorporates by reference all preceding paragraphs relevant to pay, assignments, and workload.

115. All claims herein are administratively exhausted except for marked with  or .

116. Plaintiff and male comparators worked at DLIFLC-Monterey under the same decision-making authority and similar working conditions.

117. Upon promotion in 2007, Plaintiff was denied the standard 6% rank-advancement increase routinely granted to similarly situated faculty. In 2008, the agency changed its

policy and began granting the 6% increase as a matter of course to new promotees in the same establishment. This differential has compounded in every paycheck since 2007, creating an ongoing wage disparity based on sex.

118. Plaintiff and male SLS colleagues performed substantially equal work under similar conditions. However, Plaintiff was assigned additional teaching duties (10-15 hours weekly) without corresponding compensation, effectively reducing her hourly wage rate compared to male comparators who were not assigned comparable extra duties.

119. On information and belief, based on observable promotions, assignments, and agency pay-setting practices, male comparators received higher base compensation for substantially equal work during overlapping periods of employment. Exact salary records are maintained by Defendant and will be produced in discovery.

120. Under *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), the wage differential cannot be justified by: (a) seniority (Plaintiff's tenure equals or exceeds comparators); (b) merit (Plaintiff's performance ratings equal or exceed comparators); (c) quantity/quality system (none documented); or (d) legitimate factor other than sex (the 2007 denial lacked contemporaneous non-gender-based justification).

121. Each discriminatory paycheck constitutes a continuing violation, with Defendant's denial of the 6% increase to Plaintiff while routinely granting it to others, combined with systematic assignment of additional unpaid duties, demonstrating willful disregard of EPA requirements.

122. Male comparators receive preferential compensation through favorable assignments, reduced workloads, and protection from accountability measures, while Plaintiff performs additional unpaid duties, effectively creating wage disparities for substantially equal work.

123. On information and belief, a male full professor with Plaintiff's 23 years of experience earns about 20% more on annual salary. Male faculty with substantially equal duties— some at lower academic rank and with fewer years of service—received higher base compensation during overlapping periods.

124. This claim is reinforced by EEOC judge guidance in Sept.-Oct. 2024 holding that Equal Pay Act claims remain live due to union failure.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, back pay, liquidated damages, attorney's fees, and such other relief as the Court deems just and proper.

## COUNT V – VIOLATION OF FIFTH AMENDMENT DUE PROCESS

125. Plaintiff incorporates by reference the relevant factual allegations in the preceding paragraphs as if fully set forth herein.

126. All claims herein are administratively exhausted except  or .

127. Plaintiff has constitutionally protected property interests in her continued federal employment under *Board of Regents v. Roth*, 408 U.S. 564 (1972), and liberty interests in her professional reputation. The public labeling as "unethical" combined with tangible adverse actions satisfies the stigma-plus standard.

128. Defendant deprived Plaintiff of due process through: (a) structurally biased administrative proceedings where the same officials combined prosecutorial and adjudicative functions; (b) manipulation of evidence and witness removal without notice during EEO proceedings; (c) failure to provide adequate notice before imposing adverse actions including award rescission; and (d) denial of meaningful opportunity to respond to charges and procedural irregularities.

129. These procedural violations caused substantial prejudice, including stigmatization, career harm, and denial of fair adjudication, as demonstrated by the May 2023 forced reassignment, systematic position denials, and January 2025 award rescission.

130. Under *Mathews v. Eldridge*, 424 U.S. 319 (1976) and *Axon Enterprise v. FTC*, 598 U.S. 175 (2023), being subjected to constitutionally defective proceedings inflicts present injury requiring immediate relief.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, damages, and such other relief as the Court deems just and proper.

## COUNT VI – VIOLATION OF FIRST AMENDMENT FREE SPEECH

131. Plaintiff incorporates by reference the relevant factual allegations in the preceding paragraphs as if fully set forth herein.

132. All claims herein are administratively exhausted except for  or .

133. Plaintiff engaged in protected speech on matters of public concern by reporting: (a) discrimination and institutional misconduct to the Inspector General in May 2023; (b) violations of federal confidentiality protections in February 2024; and (c) government waste and procedural irregularities affecting federal programs.

134. These disclosures addressed matters of public concern rather than employee grievances, as they involved systemic violations affecting multiple students and federal programs, bringing them outside the scope of ordinary job duties under Garcetti v. Ceballos, 547 U.S. 410 (2006).

135. Under *Jensen v. Brown* (9th Cir. 2025), Plaintiff's speech regarding academic standards and institutional integrity at a federal educational institution constitutes protected academic speech on matters of public concern.

136. These disclosures addressed government waste, institutional integrity, and violations of federal law—core matters of public concern under *Pickering v. Board of Education*, 391 U.S. 563 (1968).

137. Following each disclosure, Defendant retaliated through adverse employment actions, culminating in the December 31, 2024 coordination directive characterizing her protected speech as disruptive "mechanisms" requiring institutional "mitigation."

138. Under the *Pickering* balancing test, Plaintiff's speech interests outweigh any administrative concerns, as her disclosures caused no operational disruption while serving significant public interests in accountability and transparency.

The adverse actions were designed to chill protected speech and would deter a reasonable person from engaging in similar expression.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, damages, and such other relief as the Court deems just and proper.

**COUNT VII – VIOLATION OF THE PRIVACY ACT (5 U.S.C. § 552a)**

21

Plaintiff incorporates by reference the relevant factual allegations in the preceding paragraphs as if fully set forth herein.

139. All claims herein are administratively exhausted except for marked  & .

140. Defendant maintained systems of records containing personally identifiable information about Plaintiff, including EEO complaint records, personnel files, and confidential mediation materials protected under the Privacy Act of 1974.

141. Defendant willfully disclosed Plaintiff's protected records without her written consent through: (a) February 2024 transmission of privileged EEO materials directly to Plaintiff in violation of confidentiality protections; (b) December 31, 2024 smoking gun email explicitly circulating Plaintiff's EEO status to multiple senior officials; and (c) dissemination of confidential ROI information containing Plaintiff's personal employment details.

142. These unauthorized disclosures violated the Privacy Act's "no disclosure without consent" rule under 5 U.S.C. § 552a(b), as none of the twelve statutory exceptions applied to permit disclosure.

143. The disclosures were made willfully and in knowing violation of Privacy Act requirements, as evidenced by the coordinated nature of the December 31, 2024 email and the deliberate circulation of confidential EEO information to facilitate institutional retaliation.

144. As a direct result of these Privacy Act violations, Plaintiff suffered reputational harm, professional stigmatization, and exposure to coordinated institutional retaliation that would not have occurred absent the unauthorized disclosures.

145. Defendant's actions constitute willful violations subject to civil liability for actual damages.

WHEREFORE, Plaintiff requests declaratory and injunctive relief, actual damages, attorney's fees, and such other relief as the Court deems just and proper.

**SUMMARY OF HARMS**

Defendant's conduct has caused multiple categories of irreparable harm:

**Constitutional Harm**: The biased and retaliatory procedures denied Plaintiff her Fifth Amendment due process rights. Once the process is tainted, every subsequent action is irreparably infected, and no monetary remedy can cure the constitutional deprivation.

**Personal Harm**: Plaintiff has endured severe psychological and physical distress, including chronic anxiety, insomnia, and deteriorating health. These harms continue daily and cannot be undone retroactively.

**Financial Harm**: Defendant's denial of equal pay, rescinded awards, and manipulated appraisals inflicted direct economic losses. These include loss of back pay, benefits, and career advancement opportunities that cannot be fully restored.

**Reputational and Privacy Harm**: Defendant's unlawful disclosure of Plaintiff's EEO activity and retaliatory narratives damaged her professional reputation and breached confidentiality. Such stigma and exposure undermine her standing with colleagues and leadership, creating lasting injury.

**Student Harm** Defendant's actions deprived students of individualized learning support by relying on fraudulent, duplicated reports in place of genuine advising. This denied students tailored guidance, delayed critical interventions, and undercut their preparation for military readiness. The resulting academic setbacks not only harmed the students directly but also undermined the Army's investment in training and the public interest in producing combat-ready linguists.

**Public Interest Harm**: The retaliation and concealment of misconduct compromise the integrity of federal institutions, waste taxpayer resources, and endanger national security interests by weakening student preparation. Protecting whistleblowers and enforcing equal treatment is therefore vital to the public interest.

**CONCLUSION**

For the reasons stated in the foregoing counts, timeline, and harms, Plaintiff respectfully submits that the Complaint adequately pleads violations of Title VII, the Equal Pay Act, the Privacy Act, and the First and Fifth Amendments. Taken together, the facts show a pattern of systemic discrimination, retaliation, hostile work environment, and constitutional

deprivations. Immediate judicial intervention is required to redress past harms and to prevent continuing and escalating violations.

## VI. PRAYER FOR RELIEF

Plaintiff expressly reserves the right to amend her complaint at or before the time of trial of the action herein to include all terms of damages not yet ascertained. Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

1. Enjoin Defendant from imposing, enforcing, or threatening further disciplinary action, including but not limited to the September 2025 counseling letter, based on Plaintiff's protected EEO and whistleblowing activity.

2. Order Defendant to immediately halt any removal proceedings, reassignments, workload manipulations, or other adverse actions taken in retaliation for Plaintiff's protected activity.

3. Restore Plaintiff's full access to her student advising, teaching, and core job duties, without restriction or discrimination.

4. Rescind all prior retaliatory actions, including rescission of awards, downgraded appraisals, and exclusion from opportunities, and restore Plaintiff to the position she would have occupied absent unlawful discrimination and retaliation.

5. Prohibit Defendant from disseminating Plaintiff's confidential EEO or whistleblower status, and order implementation of court-supervised confidentiality protections (29 C.F.R. § 1614.108(b)).

6. Order equal pay and workload parity with similarly situated colleagues, as required by the Equal Pay Act and Title VII.

7. Prohibit Defendant from using reorganizations or other pretexts to mask retaliation or discrimination.

8. Preserve all records, communications, and documents related to Plaintiff's employment, complaints, and any investigations.

9. Appoint an independent monitor or require regular compliance reporting to the Court.

10. Order Defendant to provide training to leadership and counsel on anti-retaliation, confidentiality, and equal employment obligations.

11. Award back pay, front pay, benefits, and any other equitable relief necessary to fully compensate Plaintiff for unlawful treatment.

12. Waive any bond requirement under Federal Rule of Civil Procedure 65(c), given Plaintiff's status as a whistleblower and public interest plaintiff. See Barahona-Gomez v. Reno, 236 F.3d 1115 (9th Cir. 2001).

13. Grant *such other and further relief as the Court deems just and proper.*

**JURY TRIAL DEMANDED**: Plaintiff demands a trial by jury.

Respectfully submitted,

/s/ *Hang Zhang*

Hang Zhang, Ph.D.

Professor

Defense Language Institute

Department of the Army

rosezi@yahoo.com

Dated: September 29, 2025