**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

HANG ZHANG,

Plaintiff,

v.

ADAM R. TELLE, Acting Secretary of the Army,

Defendant.

Case No. 3:25-cv-03381-AMO

**SECOND AMENDED COMPLAINT FOR:**
(1) First Amendment Retaliation;
(2) Fifth Amendment Due Process;
(3) Disparate Treatment (Title VII);
(4) Retaliation (Title VII);
(5) Hostile Work Environment (Title VII);
(6) Violation of the Privacy Act

**[DEMAND FOR JURY TRIAL]**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

JURISDICTION, VENUE AND PARTIES .......... 4

EXHAUSTION OF ADMINISTRATIVE REMEDIES .......... 5

FACTUAL ALLEGATIONS .......... 5

ORGANIZATION BACKGROUND .......... 5

SUMMARY TABLES .......... 7

Background: Professor Zhang Builds a 23-Year Record Helping Military Students Succeed. .......... 13

Phase I: Professor Zhang Challenges a Reassignment, Made Without Notice Through Manipulated TDA Data, That Targeted Minority Women Professors While Devaluing Their Specialist Expertise. .......... 14

Phase II: Defendant Retaliates Against Professor Zhang Through Nonselections, Key Witness Removal, and Altered Performance Records. .......... 16

Phase III: Professor Zhang Challenges the Non-Implementation of the Commandant's Student-Learning Policy, and Agency Counsel Directs Administrators to Treat Her Complaints as a "Mechanism" Requiring "Mitigation." .......... 17

Phase IV: Agency Counsel Creates Jeopardy Through Unauthorized Transmission of Privileged Material to Professor Zhang, and Officials Refuse to Cure It. .......... 21

Phase V: Administrators Silence Professor Zhang's Reports on Their Own Divergence From Military Academic Requirements .......... 23

Phase VII: After Professor Zhang Takes Her Reports Outside the Chain, Administrators Expose Her Identity, Restrict Her Student Contact, Investigate Her, and Threaten Removal .......... 30

Phase VIII: Defendant Continues Disciplinary Threats, Manipulates Her Appraisal, and Escalating Unequal Workload and Scrutiny .......... 34

Phase IX: Continuing Injury: The Letter, the Investigation, Counsel's Dissemination Directive, and the Forced Possession of Privileged Material Remain, Under the Same Officials .......... 37

Phase X: Defendant's Actions Deprived Professor Zhang of Her Rights, Causing Financial, Emotional, and Reputational Damage. .......... 41

COUNT I FIRST AMENDMENT RETALIATION .......... 42

Role and Reporting .......... 42

A. Professor Zhang Engaged in Protected Speech on Matters of Public Concern .......... 43

B. Agency Counsel Urged Top Management to Disseminate Professor Zhang's EEO Status and to "Mitigate" Her December 31, 2024 Speech as a "Mechanism" .......... 44

C. Defendant Subjected Professor Zhang to Adverse Actions That Would Chill a Person of Ordinary Firmness .......... 45

D. Protected Speech Was a Substantial or Motivating Factor ..........46
E. Defendant Punished Professor Zhang for Reporting Duplicated Advising Records and Management's Failure to Correct Them ..........46
F. The Asserted Justification Was Pretextual ..........46
G. No Disruption: Pickering Favors Professor Zhang ..........46
H. Continuing Injury and Relief ..........47
COUNT II VIOLATION OF FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS ..........48
A. FEBRUARY 7 UNAUTHORIZED TRANSMISSION: GOVERNMENT-CREATED JEOPARDY AND REFUSAL TO CURE ..........48
B. PROFESSOR ZHANG WAS DEPRIVED OF PROTECTED PROPERTY AND LIBERTY INTERESTS WITHOUT CONSTITUTIONALLY ADEQUATE PROCESS ..........49
C. STRUCTURAL BIAS AND ROLE COLLISION ..........49
D. STIGMA-PLUS: OFFICIAL STIGMATIZATION ACCOMPANIED BY ALTERED STATUS ..........50
E. PROCEDURAL TRAPS ..........50
F. MANIPULATION OF RECORDS AND EVIDENTIARY FOUNDATION ..........51
G. DENIED SAFEGUARDS AND CONTINUING INJURY ..........51
COUNT III DISPARATE TREATMENT ON THE BASIS OF SEX, RACE, AND NATIONAL ORIGIN UNDER TITLE VII ..........52
COUNT IV TITLE VII RETALIATION ..........54
A. Protected Activity ..........54
B. Materially Adverse Actions ..........55
C. Causation ..........57
D. Independent Statutory Basis, Exhaustion, and Continuing Injury ..........58
COUNT V HOSTILE WORK ENVIRONMENT ..........59
COUNT VI VIOLATION OF THE PRIVACY ACT, 5 U.S.C. §§ 552a(b), (g)(1)(D) ..........63
Disclosure 1 — April 24, 2024, Confidential Mediation Records ..........63
Disclosure 2 — December 31, 2024, EEO Complaint Records ..........64
Disclosure 3 — Associate Provost to Chief of Staff and the Provost (disclosed in sworn testimony recorded April 1, 2025) ..........64
Disclosure 4 — August 20, 2025, Performance Appraisal and Whistleblower Report ..........64
PRAYER FOR RELIEF ..........65

## INTRODUCTION

1. Following Professor Zhang's protected disclosure of serious compliance failures within the Defense Language Institute ("DLI"), Defendant retaliated through constitutionally defective conduct. After Professor Zhang engaged in protected activity through internal and external reporting channels, Defendant escalated scrutiny, restricted her professional role, disseminated stigmatizing accusations, and engineered procedural traps that deprived her of due process while chilling further speech.

2. Professor Hang Zhang is a tenured Full Professor at the Defense Language Institute, where the Army trains linguists for the armed forces and the federal government. For more than 23 years, Professor Zhang helped struggling military students master a language in a tight recovery window. The Associate Provost had testified under oath that he had no concerns about her work, confirmed by her Dean later. Professor Zhang was awarded four Commandant's certificates and a coin in the past three years.

3. Professor Zhang received her Ph.D. in Linguistics from University of Illinois at Urbana-Champaign. She's committed to equal treatment, academic integrity and to protecting her students whose careers and livelihoods depend on success in a highly intensive language program. When she faced an institutional cover-up of misconduct that deprives students of their opportunity, she spoke up.

4. In 2023, Associate Provost reassigned Professor Zhang out of the specialist position she had won competitively and added Chinese teaching to her duties without notice, while white male colleagues kept the assignments they wanted. Dean of UKP, a key decisionmaker in the reorganization, later admitted under oath that he had repeatedly told her to "go back to Chinese school." Professor Zhang filed a complaint. Administrators used DLI's internal processes to suppress her.

5. Professor Zhang asked how the Commandant's student-learning policy was supposed to reach the classroom and was told to "read the memo." When she asked to see the plan, her email was routed to Agency Counsel within one minute. Counsel urged senior

officials to disseminate Professor Zhang's EEO status and treat her protected activity as a "mechanism" to be mitigated.

6. Five weeks later, while Professor Zhang was receiving 3 new classes and graduating 4 others, Counsel sent her privileged material she had neither requested nor been authorized to possess. Unrepresented, Zhang spent the entire weekend, and many afterwards, without sleep researching how to handle privileged material forced into her possession. The Supervisory Attorney, IG and EEO refused to cure the legal jeopardy; IG and EEO repeated Counsel's excuse for the December 31 email, that no attorney-client relationship could form three weeks before the transmission. Zhang had never claimed Army representation.

7. Professor Zhang saw a colleague duplicate advising reports in bulk in violation of the command's requirement of individualized support, depart from the curriculum endorsed by Associate Dean, Deputy Dean, and the Chief MLIs, reject the tracker that military reporting relies on, and dismiss teaching on learning styles, the foundation of individualized advising. Students were confused and anxious. Administrators could have corrected the colleague or cleared him.

8. Instead, they ordered Professor Zhang to cross-advise the colleague's students. Realizing the problem was larger, Professor Zhang reported the copied records and curriculum departures to Supervisor, Dean, the Associate Provost, and then the Chief of Staff. The Chief of Staff, who already knew of her EEO activity, as the Associate Provost testified, exposed her within 20 minutes to the administrators she had reported. Her protected activity had come full circle, as Counsel had urged.

9. Dean had already called Professor Zhang's reporting "unethical" and later threatened a police welfare check. Within days of the Chief of Staff's email, Dean barred Professor Zhang from student contact and Deputy Dean opened an investigation based on a couple of anonymous comments despite overall positive feedback. Supervisor, on Dean's guidance, issued the first disciplinary letter of her 23-year career, made stigmatizing mental health references, and threatened removal from federal service. Professor Zhang was given no notice and no chance to answer before any of it. Supervisor later admitted that no

performance standards, IDP, or planning meeting had been provided in the 10 months before the letter.

10. AP, Dean and Supervisor repeatedly punished Zhang for reporting the white male colleague's known noncompliance. They ordered her to: (1) cross-review his duplicated advising reports; (2) meet biweekly and alone with him; (3) incorporate his curriculum changes, which academic and military officials had rejected; (4) improve his elective attendance, which he said was near zero; (5) "refresh his memory" on the tracker he had already rejected; and (6) ensure students received the same materials, after Supervisor stated openly that he followed no endorsed curriculum, and indeed none at all.

11. Professor Zhang then discovered the colleague's copied reports disappeared from the SharePoint folders. Supervisor later told her the folders holding her work had been locked without notice. Dean accused Professor Zhang of duplicating reports herself but withheld two misnamed reports as evidence until after Chief of Staff's outing. The colleague later admitted publicly at meetings that he had not followed the curriculum, uploaded his reports, or kept the required tracker. He was never investigated or disciplined.

12. Shortly after Defendant detailed the Supervisor and transferred the colleague, Defendant restored standard curriculum, Zhang's proposed tracker, learning style as part of the curriculum. They knew the standards all along. They had knowingly destabilized official curriculum, jeopardized service members' careers, and disciplined a well-respected professor to protect the white male specialist's and conceal their own misconduct.

13. Professor Zhang remains on the hook. The discipline, the restriction, and the investigation against her were never withdrawn. Dean who had called her "unethical" still rates her work and has made her the only specialist for five departments and 460-480 students, 3 to 5 times the caseload of comparable specialists. Because administrators insist that students of both specialists receive the same materials, Professor Zhang no longer recommends additional resources for fear of further investigation. Dean and Supervisor tried again to lower her 2026 rating but could not justify, and Defendant finally restored the rating without the step increase.

14. Dean also tightens the scrutiny on Professor Zhang beyond official uniform SLS specialist requirements practiced across schools in UGE. Dean now requires student's immediate feedback on every of Professor Zhang's class, student's signature on every advising report, and a tracker to tracking every student she advises, which Dean had never enforced on the white male colleague.

15. Defendant has never identified a single disruption caused by Professor Zhang's speech in over three years. The public funds these programs to produce linguists for the nation. The copied records, the investigation, and the discipline contravene that purpose. Depriving Professor Zhang and faculty like her of their rights to academic speech deprives military students of a quality education and weakens national defense.

16. Academic freedom is "a special concern of the First Amendment," and the classroom "is peculiarly the 'marketplace of ideas.'" *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). At an institution that trains the nation's military linguists, teachers who speak up are how instruction improves.

## JURISDICTION, VENUE AND PARTIES

17. Plaintiff, Professor Hang Zhang ("Professor Zhang," "Zhang" or Plaintiff), brings this action under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e et seq.), for discrimination based on race (Chinese), sex (female), national origin (P. R. China), retaliation for engaging in protected EEO activities; under the First and Fifth Amendments for violations of Free Speech and Due Process, respectively; and under Privacy Act.

18. Plaintiff was subjected to a hostile work environment created and sustained by high-level agency officials, including Agency Counsel and the Chief of Staff, who coordinated to undermine her protected activity and obstruct her access to a fair resolution process.

19. After Professor Zhang reported disparate treatment, Defendant reassigned, isolated, and retaliated against her using the full weight of its institutional power. The retaliation escalated in phases, revealing a systemic pattern of discrimination and reprisal.

20. This Court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

21. Venue is also proper under 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 552a(g)(5) because the events giving rise to the claims occurred in this District.

22. Plaintiff Hang Zhang is a civilian federal employee currently assigned to the Defense Language Institute Foreign Language Center (DLI).

23. Defendant Adam R. Telle (acting) is the Secretary of the Army and is sued in his official capacity. The Department of the Army is Plaintiff's employer within the meaning of Title VII.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

24. Plaintiff timely initiated EEO counseling in May 2023 and filed a formal complaint of discrimination on June 13, 2023. On February 23, 2024, she requested a hearing before the EEOC. More than 180 days passed without a final agency decision, and Plaintiff filed this action under 42 U.S.C. § 2000e-16(c).

25. Plaintiff timely amended her complaint to add retaliation and related acts that occurred after filing, including through supplements and amendments in 2025. Those acts are like or reasonably related to her original claims.

26. Plaintiff's later EEO complaints, which challenge continuing acts here, remain pending, including a second case now before the EEOC. Those acts are like or reasonably related to the matters already exhausted.

**FACTUAL ALLEGATIONS**

***ORGANIZATION BACKGROUND***

27. DLI operates through an academic supervisory structure and a military command and staff structure. Professor Zhang's academic reporting line ran from Supervisor → Dean → Associate Provost for Undergraduate Education → Provost → Commandant. From March 2026, the Assistant Dean served as her immediate supervisor. The Chief of Staff served within the command and staff structure, outside her ordinary academic reporting line.

*Academic line*

- Supervisor: Dr. Yali Chen, immediate academic supervisor, January 2025–March 2026.
- Former Supervisor: Ms. Marinela Cyriacks, immediate academic supervisor, June 2023–January 2025.
- Dean: Head of Professor Zhang's assigned school and her senior rater, reporting to the Associate Provost, throughout the events after mid-2024.
- Former Dean: Dr. Viktoriya Shevchenko, Dean of the school until mid-2024.
- Associate Provost for Undergraduate Education ("AP"): Dr. Johnathan Gajdos, responsible for undergraduate academic administration, until early 2026; thereafter "former AP Dr. Gajdos." 2023-March 2026.
- New Associate Provost: Dr. Gajdos's successor, in place by March 2026.
- Provost: Senior academic official overseeing the Associate Provost.

*School level*

- Assistant Dean: School-level academic administrator; immediate supervisor of both specialists from March 2026.
- Deputy Dean: School-level academic administrator, until October 2026.
- Associate Dean: School-level military officer, throughout the events.
- Chief MLI: Chief Military Language Instructor, the school-level senior enlisted instructional official. SSG Buchman, 2025–2026; SSG Arnold, 2026–present.
- Dean of UKP: Dean of another school, who told Professor Zhang to "go back to Chinese school," throughout the events.

*Comparators:*

- Mr. Michael Gelbman: white male in the same 2023 SLS reassignment cohort.
- Dr. Timothy Berndt: white male in the same Faculty Development department under ETD, same organization as Zhang.

- The white male Specialist (“the colleague”): white male SLS with Professor Zhang’s job title, same supervisor, same school, same organization as Zhang. Transferred August 2026.

*Command and Installation:*

- Commandant: DLI’s commanding officer, overseeing the academic and military structures. Colonel James Kievit until July 2024; Colonel Christy Whitfield from July 2024 to present.
- Chief of Staff: Senior command and staff official, throughout the 2025 events.
- Dean of Students: Military official who conducted Professor Zhang’s November 2024 interview, through the 2024–2025 events.

*Oversight and counsel*

- Inspector General: Oversight and investigative office, outside Professor Zhang’s ordinary academic reporting line.
- Agency Counsel: Attorney representing Defendant in Professor Zhang’s EEO proceedings and advising DLI administrators.
- Supervisory Attorney: Supervisory counsel overseeing EEO representation.

*Names appear only where two people held the same title: the two supervisors, the two deans, the two Associate Provosts, the two Chief MLIs, two Chiefs of Staff, and the two Commandants.

***SUMMARY TABLES***

28. The following tables summarize allegations set out in the factual chronology. Table 1 identifies officials’ documented knowledge of Professor Zhang’s protected activity and the actions linked to that knowledge. Table 2 presents a chronological awareness matrix. Tables 3 and 4 summarize the timing of protected activity, knowledge, and subsequent actions from different perspectives. Table 5 lists the government-created procedural traps.

29. **Table 1 — Decision-Maker Knowledge of Protected Activity**

| **Actor / Decision-Maker** | **Role** | **Date(s) Knowledge disseminated** | **Protected Activity Known** | **Source Allegation / Evidence/FAC** | **Adverse Action Linked** |
|---|---|---|---|---|---|
| Agency Counsel | Legal counsel for DLIFLC | Dec. 31, 2024 disseminating | Plaintiff's protected disclosures and EEO status | ¶ 72; Dec. 31 coordination email (Plaintiff copied) | Institutional coordination of response; later Feb. 7 transmission |
| Senior DLIFLC Leadership ("Senior Leaders") | Decision-makers / supervisors | Dec. 31, 2024 receiving | Dissemination of Plaintiff's protected disclosures | ¶ 72 (email circulated to senior leadership) | Jan. Award rescission; exclusion from meetings; later discipline |
| Agency Counsel | Legal counsel | Feb. 7, 2025 Unauthorized transmission | Substance of Plaintiff's disclosures | ¶ 85 (unauthorized transmission) | Creation of unconstitutional disclosure dilemma; chilling effect |
| Associate Provost (knowledge NLT Mar. 4, 2024) | Performance Authority | ROI Mar. 2024; Feb. testimony recorded Apr. 1, 2025, disseminating | Admission: no performance concerns disclosed EEO status to Chief | Ex. A, Q4, Q8, Q10 | Demonstrates falsity of future discipline; establishes pretext baseline ¶ 96 |
| Chief of Staff | Senior official | Aug. 20, 2025 disseminating | Plaintiff's protected activity and disclosure history | ¶ 146 (outing email) | Refused to investigate Duplicated reports |
| Dean & Supervisor | Direct supervisors | Aug. 20, 2025 Disseminating receiving | Plaintiff's EEO/ Whistleblower | ¶¶ 146 | Denial of student contact; escalation to discipline Removal-level counseling letter ¶ 78 |

| Actor / Decision-Maker | Role | Date(s) Knowledge disseminated | Protected Activity Known | Source Allegation / Evidence/FAC | Adverse Action Linked |
|---|---|---|---|---|---|
| Institutional Decision-Makers (collectively) | Coordinated leadership | Aug.–Sept. 2025 circulating | Protected-activity history | ¶¶ 78, 154; Counts I–VI (¶¶209–342) | Counseling letter; mandatory meetings; continued retaliation |

30. **Table 2 — Chronological Awareness Matrix.**

| Decision-Maker | Role | Knowledge Source | Date | Connection to Adverse Action |
|---|---|---|---|---|
| Counsel | Agency Counsel | Feb. 7 unauthorized transmission of confidential material | Feb. 7, 2025 | Privileged disclosure |
| AP | Performance Authority | Admitted knowledge of EEOC case from counsel, confirmed no performance concerns, and disclosed EEO status to Chief (PI Mot. Ex. B Q 4, 8, 10) | April 1, 2025 | Shows falsity/pretext |
| Dean | Senior Supervisor | Cross-review directive; stigmatizing emails | June-July 2025 | Created impossible task |
| AP/Dean | Senior Supervisors | AP directs regular meetings while allowing the white male colleague a separate tracker; Dean formalizes the meeting requirement | July 23, July 28, 2025: | Created impossible task, set up for discipline |
| Chief | Senior Official | Aug. 20 outing email to leadership. | Aug. 20, 2025 | Disseminated whistleblower status while refusing investigation |

31. **Table 3 — Temporal Proximity Between Protected Activity and Adverse Actions.**

| Date | Event | Protected Activity or Adverse Action | Inference Supported |
|---|---|---|---|

| Date | Event | Protected Activity or Adverse Action | Inference Supported |
|---|---|---|---|
| Dec. 31, 2024 | Retaliation coordination email circulated (Plaintiff copied) | protected disclosure / dissemination | Institutional awareness of protected speech |
| Jan. 30, 2025 | January award rescinded, removed from the ceremony | Adverse disclosure | Retaliation + reputational harm |
| Feb. 7, 2025 | Unauthorized transmission by counsel | Retaliatory escalation / chilling conduct | Early retaliation + legal exposure trap |
| Around Feb. testimony recorded Apr. 1, 2025 | AP admitted EEO knowledge from counsel; confirmed no performance concerns; disclosed EEO status to Chief (PI Ex. B) | Knowledge Dissemination | Dissemination Institutional awareness + falsity of subsequent discipline |
| June–July 2025 | cross-review uncovers duplicated advising reports | Whistleblowing context / motive crystallizes | Defendant's motive to silence reporting |
| Aug. 20, 2025 | Chief's outing email referencing duplicated reports | Adverse public disclosure | Retaliation + reputational harm |
| Aug. 21, 2025 | Denial of student contact | Adverse action | Immediate punitive response |
| Aug. 22, 2025 | Sham investigation initiated | Adverse action | Pretextual enforcement |
| Sept. 9, 2025 | Counseling letter issued | Adverse action | Formal discipline following speech |
| Fall 2025 | Mandatory discriminatory meetings / removal threats | Adverse conditions | Escalating retaliation |
| May 30 - Dec. 2025 | Withholding of Commandant Coin/Certificate | Adverse action | Ongoing retaliatory deprivation |
| May-Sept. 2026 | Appraisal downgrade (later restored) | Adverse Action | Appraisal manipulation, inconsistent rating authority, and loss of step increase |
| August 2026–present | Assignment as sole SLS for five departments, 460–480 students | Adverse conditions | Disproportionate workload and continuing unequal treatment |

32. **Table 4 — Temporal Proximity & Causation Timeline.**

| Date | Protected Activity / Disclosure | Knowledge Dissemination | Adverse Action | Temporal Gap | Legal Significance |
|---|---|---|---|---|---|
| May 5, 2023; June 13, 2023 | Initial EEO contact; Formal complaint | Agency EEO channel | Non-selection for Test Specialist (June 4), ODA position (June 14), Operations Research Analyst (June 16) | Days - 3 weeks | Days/weeks are sufficient to infer causation (Yartzoff; Passantino) |
| Dec. 31, 2024 | Dissemination of protected disclosures | Coordination email circulated to senior leadership | Award rescission (Jan. 30, 2025); exclusion from meetings | 30 days | Close proximity defeats "no causation" at Rule 12 |
| Feb. 7, 2025 | Unauthorized transmission of protected materials | Agency counsel involvement | Government-created jeopardy; chilling effect | Immediate | Harm inherent; no "harmlessness" doctrine applies |
| Apr. 1, 2025 | Dissemination of protected disclosures | AP admitted receiving EEO status from counsel; confirmed no performance concerns; disclosed status to Chief | Jun/Jul cross-advising order; forced meeting with reported fraud; Chief's outing; Sept counseling | 2 - 5 months | institutional knowledge at provost level; falsity of later; Chief's knowledge preceded outing/discipline |
| July 17, 2025 | Request for corrective action | Following up on colleague's duplicated reports | Dean's reply, calling her reporting "unethical" | Same day | First documented adverse characterization of her speech |
| Aug. 20, 2025 | Chief of Staff outing Plaintiff's disclosures | Institutional awareness confirmed | Denial of student contact (Aug. 21); sham investigation (Aug. 22) | Within 20 minutes disclosure/ 1 or 2 days | Extremely tight temporal proximity |

| Date | Protected Activity / Disclosure | Knowledge Dissemination | Adverse Action | Temporal Gap | Legal Significance |
|---|---|---|---|---|---|
| Aug. 20 2025 | Report to Chief of Staff | Senior leadership | Removal-level counseling letter (Sept. 9, 2025) | 20 days | Well within Ninth Circuit causal inference window |
| May.-Dec. 2025 | Continued protected activity | Institutional coordination | delayed Commandant recognition | Continuous | Pattern-based causation, not isolated acts |
| Ongoing | Continued EEO activity and academic misconduct reporting | Institutional knowledge and coordination documented through 2025–2026 | Unrescinded removal-level counseling; unresolved investigation; manipulated appraisal process and loss of step increase; disproportionate workload; exclusion from public recognition | Continuing | Pattern-based causation; continuing adverse conditions and chilling of protected academic speech |

33. **Table 5 — Government-Created Catch-22s and Impossible Traps.**

| Government Action | Plaintiff's Only Available Response | Constitutional Continuing Injury |
|---|---|---|
| Feb. 7 unauthorized transmission of privileged/retaliation material involving counsel; refusal to cure after notice in four forums; later reliance on the tainted process | Disclose contents → risk discipline or liability under 18 U.S.C. § 641; Withhold → accused of non-cooperation | Forced choice between self-incrimination and rights preservation |
| Demand Zhang substantiate retaliation using records she was denied access to | Attempt compliance without access → failure; Report impossibility → labeled unethical | Government-created impossibility |
| Dean-ordered cross-review while Supervisor later admitting folders were locked / inaccessible | Perform impossible task or be disciplined | Structural unfairness + pretext |

| **Government Action** | **Plaintiff's Only Available Response** | **Constitutional Continuing Injury** |
|---|---|---|
| Dean's accusation of "unethical conduct" for reporting duplicated reports while asserting "no evidence exists" | Either Dean accused Zhang without evidence or relied on deleted evidence | Stigma-plus + spoliation inference Dean remains senior rater, never withdraws accusation |
| AP swears he relied on TDA for every assignment; record contradicts it; May 2023 reassignment rests on the manipulated file without notice | Accept reassignment on a false record, or contest it with no forum and no notice | Deprivation of a competitively selected position without pre-deprivation process |
| Demand Zhang to merge her "unapproved" tracker with never-identified "existing" trackers; exempt white male from uniform tracking military requires | Impossible merger; Comply in any way→ violate command policy; Refuse → discipline | Government-created impossibility |
| Directive to adopt curriculum departures the Deputy Dean and military command had rejected | Comply → defy the endorsed standard; Adhere → counseled for failing to "standardize" | Punishment of protected academic speech; shifting standard |
| Excessive current workload: sole specialist for five departments | Protest → further retaliation/termination; Stay silent → Dean collects anonymous comments for future downgrade or discipline | Speech chilled either way |

***Background: Professor Zhang Builds a 23-Year Record Helping Military Students Succeed.***

34. Professor Zhang, a Chinese-American female who holds a Ph.D. in Linguistics from University of Illinois (2003), started working at DLI in 2002. She has held a tenured appointment since 2006 and holds the rank of Full Professor.

35. In 2018, Professor Zhang interviewed for the Senior Student Learning Specialist (SLS) position and was formally selected through a competitive process. She worked under Faculty Development (FD) under ETD (Education Technology Directorate). The SLS taught preparatory modules in English on English grammar, resiliency, and similar topics to new students, not target language instruction.

36. Professor Zhang's personnel file contains commendations for curriculum development, student outcomes, and teaching excellence, with no prior disciplinary actions in 23 years of federal service and consistent higher performance ratings. Her evaluations from 2022 through 2023 rated her "Exceeds Expectations," "Outstanding Model," and "Excels." She received four Commandant's Awards and a Commandant's Coin from 2024 to 2026.

***Phase I: Professor Zhang Challenges a Reassignment, Made Without Notice Through Manipulated TDA Data, That Targeted Minority Women Professors While Devaluing Their Specialist Expertise.***

37. Pre-2023, Senior Administrators made derogatory remarks, including referring to female faculty as a "stable of teachers" and admitting "all leaders at DLI are old white male," and similar statements.

38. Prior to May 5, 2023, during the lead-up to reorgnization, Senior DLI administrators involved in the reorganization, including Dean of UKP, repeatedly told Professor Zhang to "go back to Chinese school" based on her ethnicity, national origin, and gender, a de facto demotion erasing her SLS expertise and hard work. She refused. She did not choose the Chinese school among her three choices. The defendant singled her out.

39. On May 5, 2023, Associate Provost ("AP"), Dr. Johnathan Gajdos, forcefully reassigned Professor Zhang to the Chinese/Russian school against her three requests while granting a white male colleague, Mr. Michael Gelbman, his first choice. Citing 2023 reorganization, AP reassigned her to a school-level specialist role within his division. As a result of AP's reassignment, her appraisal was rewritten to require a full load of language teacher (10 to 15 weekly hours of Chinese language instruction) while her specialist responsibilities continued. AP combined two jobs into one as Zhang's one rated standard.

40. AP later, in March 2024, testified under oath that he relied on the TDA file for every assignment decision in that reorganization. The produced file contains many omissions, altering, and no Spanish-language designation for Mr. Gelbman, whose assignment AP attributed to Spanish. Mr. Gelbman received no Spanish-teaching

requirement. Professor Zhang received no notice of the use of this altered record reliance or opportunity to contest the version relied upon. The manipulated file remains operative.

41. On May 5, 2023, White male colleague, Dr. Timothy Berndt, with comparable Chinese language capability and teaching experience, the Faculty Development Specialist, in the same Faculty Development department under ETD as Zhang's senior SLS position, retained his preferred Faculty Development assignment and was never assigned Chinese teaching responsibilities.

42. On May 5, 2023, AP did not reassign the third male colleague with language teaching capacity from the same cohort to his target language school or assign him comparable language teaching.

43. On May 5, 2023, no other colleague in the cohort was assigned using AP's purported "language-matching" criterion.

44. On May 5, 2023, Professor Zhang contacted the local EEO office. The case officer acknowledged that assigning Professor Zhang to teach Chinese all day on top of her SLS job suggested potential discrimination.

45. In May 2023, the Inspector General's military representative encouraged filing, but the next day the IG Director abruptly denied the complaint without addressing its merits.

46. On May 11, 2023, Professor Zhang formally requested an EEO appointment via email.

47. On June 4, 2023, Defendant formally changed Professor Zhang's official post to the Chinese Russian School, following AP's reassignment, and imposed a full-time language teacher's workload of 10 to 15 weekly hours of language teaching into her performance standards in addition to her own SLS job.

48. On June 4, 2023, Former Supervisor Cyriacks showed that the only other specialist required to perform additional full-time Chinese teaching was another Chinese female professor, showing that Chinese women (and other minority females) were uniquely targeted.

***Phase II: Defendant Retaliates Against Professor Zhang Through Nonselections, Key Witness Removal, and Altered Performance Records.***

49. June 4, 2023 – **First job denial** – Defendant rejected Professor Zhang for the Test Specialist position. The selectee, Mr. Michael Gelbman, lacked a Ph.D., was two academic ranks below Professor Zhang, and lacked direct experience with Assessment and Interagency Language Roundtable (ILR) proficiency framework.

50. June 14, 2023 – **Second job denial** – One day after filing the formal EEO complaint, Professor Zhang was rejected for ODA position at ETD despite holding a Ph.D. and specific ODA experience. The selectee lacked a Ph.D. and direct ODA technical experience.

51. June 16, 2023 – **Third job denial** – Defendant rejected Professor Zhang for the Operations Research Analyst position despite holding a Ph.D. in the relevant field and strong research background.

52. On January 18, 2024, the DoD Investigator issued a scheduling letter naming as witnesses senior officials including the former Commandant (Lt. Col. Kievit), Provost, and former Chief of Staff (Mr. Steve Collins).

53. On February 1, 2024, the DoD Investigator removed these three senior officials from the witness list without notice and later refused to explain the reason or legal basis.

54. On March 4, 2024, during sworn testimony (recorded in ROI), AP admitted regarding Zhang's reassignment: "It doesn't mean I don't see that is discriminatory".

55. On March 4, 2024, Dean of UKP who advised AP on reassignment, admitted to the "go back to Chinese school" statement in sworn testimony.

56. On March 4, 2024, in his sworn ROI testimony, AP stated that he did not know Professor Zhang and did not know her gender. The investigator noted that AP had repeatedly referred to Professor Zhang as "her" while no prior knowledge of her gender.

57. On March 4, 2024, after his live interview, AP proposed to the DoD investigator to submit the TDA (Table of Distribution and Allowances) as the basis of his reassignment decisions, almost a year into the complaint.

58. Around April-May, 2024, Previous Supervisor Cyriacks and Former Dean Shevchenko, both with explicit knowledge of Professor Zhang's EEO activity, downgraded Zhang's ratings after she signed it without notice or an opportunity to respond and denied her step increase (Professor Zhang signed in good faith and discovered this procedural irregularity around April 2025). Previous Supervisor Cyriacks told her, "you should not go to EEO" and Former Dean Shevchenko was a witness in March 2024 EEO investigation.

59. On April 24, 2024, Defendant released confidential information from its mediation with Professor Zhang to the ROI Investigator as part of its evidence, without notice or consent. The disclosure made Professor Zhang appear uncooperative.

60. On May 13, 2024 – **Fourth job denial** – Defendant denied Professor Zhang for the Assistant Director of Immersion despite superior credentials and substantial experience with immersions and DTS.

***Phase III: Professor Zhang Challenges the Non-Implementation of the Commandant's Student-Learning Policy, and Agency Counsel Directs Administrators to Treat Her Complaints as a "Mechanism" Requiring "Mitigation."***

61. On August 13, 2024, At the EEOC initial conference, the Administrative Judge stated reorganization is not a defense and allowed the Equal Pay Act (EPA) claim to proceed.

62. On October 15, 2024, Professor Zhang filed a Motion for Summary Judgment with the EEOC, stating that her reassignment was not merit-based and violated Command and Army policy.

63. In October - December, 2024, Agency Counsel caused multiple discovery delays, canceled mediation proceedings last minute, and claimed inability to identify a single witness.

64. November 20, 2024, Professor Zhang interviewed for the Academic Specialist position at UML. During the interview, Dean of Students, Lt. Col. Alivia, publicly dismissed Professor Zhang and undermined her credibility, signaling to panelists that she should not be selected. When Professor Zhang asked how faculty were expected to implement the Commandant's one-page memorandum, Dean of Students answered only that she should "read the memo."

65. On November 22, 2024, Professor Zhang, in good faith, complained exclusively through the military chain of command to the Commandant and (former) Assistant Commandant. Dean of Students apologized, attributed the exchange to his communication style, and offered in-person discussion but copied AP on his response.

66. In and around November 2024, former Supervisor Cyriacks showed Zhang duplicated student advising reports by a white male SLS colleague and mentioned chairs' complaints regarding his copy-pasting. Zhang had always individualized her advising reports and had never received such complaints.

67. November 27, 2024, Professor Zhang accepted the offer to meet and asked Dean of Students for his implementation plan for Commandant's Memorandum as pre-discussion material. Dean of Students did not respond again.

68. December 10, 2024 – **Fifth job denial** – Defendant rejected Professor Zhang for Academic Specialist position at UML. Dean of Students and AP oversaw this selection process and selected a candidate with approximately half her years of experience and one academic rank lower. The Academic Specialist position reports to the school Dean, with AP as senior rater. In 2023, AP personally assigned each SLS specialist, three levels below him.

69. On December 30, 2024, in EEOC proceedings, Zhang documented Counsel's refusal of pre-mediation discussions, last-minute mediation cancellation, and delay of document production without extensions. Within 21 minutes, Counsel responded to the same judges, characterized Professor Zhang's EEOC briefings as allegations of impropriety, and stated that she "has lost all patience."

70. On December 31, 2024, after 34 days without a response, Zhang followed up on the Dean of Students' silence despite his apology. She requested "information about the strategic plans and initiatives aligned with the Commandant's Strategic Plan," "clarity on . . . how faculty feedback is addressed," and equal respect "regardless of any non-meritorious characteristics." She asked how middle management implemented the Commandant's Strategic Plan, what role middle management served, and what oversight existed when implementation was left to faculty. She raised these concerns with officials whose authority extended beyond her supervisory chain. Her inquiry concerned fairness, transparency, institutional accountability, and the integrity of academic governance beyond her own employment interests.

71. In 1 minute, AP, despite being on leave, routed Professor Zhang's email to Agency Counsel.

72. Within 20 minutes, Counsel characterized Professor Zhang as using EEO as a "mechanism," urged top administrators to "mitigate" and urged continued dissemination of her EEO status.

73. Counsel did not identify any recipient as a likely witness, gave no witness-preparation or settlement instructions, and did not limit the information to recipients with a need to know. Counsel instead urged its further dissemination.

74. The administrators and management officials involved remain in positions capable of influencing Professor Zhang's professional standing, evaluations, and future proceedings. Professor Zhang continues to face the consequences of that unresolved institutional dissemination.

75. That instruction has never been rescinded. The instruction set no need-to-know limit and required no approval for further disclosure. Her EEO and reporting status then circulated among senior officials and beyond them, and the dissemination continues. The full extent of the dissemination will be established in discovery.

76. On January 2, 2025, Professor Zhang offered to take on more department(s) if the mission required. Associate Dean replied "whatever works for you sounds good. I have not heard about such discussions."

77. On January 15, 2025, the Commandant, Col. Christy Whitfield ("Commandant"), publicly acknowledged lack of transparency in chair selection processes, admitting procedural irregularities affecting personnel decisions.

78. On January 16, 2025, Professor Zhang requested an emergency conference with the EEOC Administrative Judge, citing the risk of unauthorized disclosure of her EEO case information after the December 31 email, and stated that she was being discriminated against based on race, sex, and national origin.

79. On January 16, 2025, for the first time, Agency Counsel stated that recipients of her December 31, 2024 email "are likely to be called as witnesses," witnesses she had withheld for 4 months during EEOC proceedings and that she owed Professor Zhang no "duty imagined by Dr. Zhang". Zhang had never claimed an attorney-client relationship with counsel. Counsel offered this explanation the same day Professor Zhang sought an emergency conference.

80. On January 17, 2025, Counsel was placed on sudden 18-day medical leave. Supervisory Attorney stated he had been "assigned unexpectedly" to the case.

81. In and around January 2025, the Chief of Staff, Mr. Mark McLoed ("Chief'), stated that the agency "can write its own rules" with "not much regulation from above" and stereotyped other races as overly emotional.

82. On January 23, 2025, Professor Zhang reported Counsel's misconduct to EEOC.

83. On January 30, 2025, Previous Supervisor Cyriacks, Supervisor Chen, met with the white male comparator for key workplace discussions on SLS issues and excluded Professor Zhang.

84. On January 30, 2025, Defendant rescinded Professor Zhang's quarterly award after public listing, without notice or explanation, and removed her from the ceremony, a

serious punishment and stigmatization in a military institute. No official informed Professor Zhang that the award had been rescinded or gave any reason. No similarly situated white male employee experienced comparable treatment. About one month later, Supervisor delivered the award with a form from HR, the Supervisory Attorney, and the Commandant. No award Professor Zhang had received before came with such a form.

***Phase IV: Agency Counsel Creates Jeopardy Through Unauthorized Transmission of Privileged Material to Professor Zhang, and Officials Refuse to Cure It.***

85. On February 7, 2025, 38 days after the December 31 email, Counsel, back on the matter without notice, emailed Professor Zhang privileged material she had neither requested nor was authorized to possess. The transmission placed her in forced possession of that material and exposed her to discipline and legal jeopardy she did nothing to create.

86. On February 8, 2025, Professor Zhang protested the unauthorized transmission by email to Supervisory Attorney and the EEOC judge and sought retrieval, handling instructions, and protection against discipline arising from possession of the material. Neither provided the requested corrective determination. No official has retrieved the material or provided handling instructions.

87. On February 16, 2025, Professor Zhang reported Counsel's unauthorized disclosure to EEO.

88. On February 21, 2025, Defendant had refused to complete document production for over 4 months without extension requests, had canceled mediations at the last minute and obstructed resolution. Production was incomplete despite Counsel's January 26 promise.

89. On February 21, 2025, Defendant finally produced TDA files following months of delay in EEOC proceedings, deleted and altered language designations of white male comparators and other relevant personnel, contradicting AP's ROI testimony and showing manipulation.

90. On February 27, 2025, Professor Zhang reported Counsel's misconduct to the IG.

91. On March 6, 2025, Defendant recalled Academic Specialist of UML position after the selectee retracted acceptance, without interviewing top candidates, making these personnel movements highly irregular.

92. On March 6, 2025, Professor Zhang shared a Comparative Grammar feedback survey with Supervisor and the Associate Dean. The Associate Dean thanked her and wrote that "it's important all students are getting the same information for these modules and that starts with everyone using the same slide deck."

93. On March 14, 2025 - **the sixth job denial** – Defendant rejected Professor Zhang via email for the Assessment Specialist position at LPAD.

94. On April 1, 2025, EEO emailed refusal to investigate counsel's misconducts, repeating Counsel's own pre-dated excuses.

95. On April 1, 2025, IG emailed refusal to investigate counsel's misconducts, repeating Counsel's own January excuse, which predated Feb transmission. IG claimed army legal advisors advised them that army lawyers cannot form attorney client relations with Zhang. Zhang never sought or claimed such representation.

96. On April 1, 2025, **EEO issued a report** and recorded Associate Provost (AP) Gajdos testified under oath around February 2025 that he had no performance concerns regarding Professor Zhang.

97. AP had known of Professor Zhang's EEO proceedings since at least March 4, 2024, when he was a witness in the EEO investigation. He testified that he knew of them through Agency Counsel and acknowledged that he disclosed Professor Zhang's EEO status to the Chief of Staff and the Provost.

98. No intervening performance event explains the removal-level discipline that followed months later.

99. The February 7 material remains in Professor Zhang's possession without authorized disposition, maintaining government-created jeopardy without corrective process.

100. During this litigation, DOJ repeatedly demanded that Zhang disclose the February 7 privileged materials, creating a government-imposed disclosure trap: compliance

risked disciplinary consequences, while refusal impaired her ability to substantiate her claims.

***Phase V: Administrators Silence Professor Zhang's Reports on Their Own Divergence From Military Academic Requirements***

101. Before cross-review directive in June 2025, the SLS specialists and supervisor shared an unrestricted folder. No access restrictions on viewing each specialist's subfolders were announced. Previous Supervisor Cyriacks required the specialists to upload advising reports to SharePoint.

102. Starting January 2025, AP reassigned Professor Zhang to the Russian School as an SLS Specialist. Associate Dean (military) of Russian School convened a series of English Grammar meetings, standardizing English Grammar module that grammar experts had developed as the foundation for comparative Grammar (taught by MLIs later) to accelerate grammar acquisition. Professor Zhang adopted it and received positive student feedback.

103. Administrators identified no pre-existing tracker and supplied no alternative standardized curriculum and never directed Professor Zhang to use the dissolved SLS center's legacy curriculum. AP's stated rationale for dissolving the center was to integrate SLS with each school's target-language instruction.

104. During March & April,2025, Dean selected Zhang to conduct suicide-prevention training for all nine school departments; the colleague was not assigned that responsibility. However, on the stand-down day, Supervisor announced having already selected the colleague to represent URU in meeting with top officials on resiliency.

105. On April 3, 2025, Zhang proposed an advising tracker, which tracks the performance of advisees' progress for easy reporting for military and civilian commands, endorsed by Associate Dean who also requested uniformity between specialists for military reporting.

106. The colleague rejected the proposed tracker, reducing it to only student names and recommended methods and rejecting the performance tracking elements and matrix.

107. April 10, 2025, IG closed the complaint concerning Agency Counsel's February 7 unauthorized transmission of privileged materials without conducting an investigation.

108. On April 21, 2025, Dean, through Supervisor Chen, repeatedly instructed Zhang to attend a two-week resiliency training, and Zhang complied before the training was canceled. Later, white male Specialist also participated in Commandant Briefings on new Command Policy, to which Zhang was never invited nor informed. Dean repeatedly pressured Zhang to take on collateral duties the colleague had declined while giving him visible assignments.

109. On April 21, 2025, after Zhang submitted her input, Supervisor Chen announced that the Previous Supervisor Cyriacks, instead of herself, should appraise Zhang's annual performance. The former Supervisor Cyriacks then requested action reports. Zhang had already submitted action research to both supervisors and objected in writing that neither supervisor had provided any feedback. Zhang raised concerns in good faith about appraisal irregularities to Dean and AP. Dean declined to serve as both initial and senior rater, and Supervisor Chen ultimately completed the appraisal.

110. On April 23, 2025, the Chief of Staff, who aired concerns for appraisal fairness publicly, emailed Zhang alone that the rating "smells unfair" and instructed her to keep him posted.

111. On May 12, 2025, Professor Zhang submitted an action report on incorporating the standardized grammar curriculum to the Associate Dean, Supervisor, the grammar expert, and Chief and Assistant Chief MLIs.

112. On May 27, 2025, Professor Zhang submitted action research on delivering electives and increasing student attendance.

113. On May 30, 2025, After the colleague reported zero attendance at his electives, Supervisor directed Zhang to improve his attendance. Zhang devoted substantial effort to making the electives useful to students.

114. On May 30, 2025, Supervisor Chen emailed both specialists warning against advising reports with "identical contents." The email identified no specialist, no report, and no student. The chairs' complaints relayed by former Supervisor Cyriacks had concerned the colleague's reports, and Professor Zhang had received no such complaint.

115. On June 5, 2025, Professor Zhang emailed the Associate Dean, Supervisor, and white male SLS colleague, copying Dean. She reported that students in sensing sessions had appreciated and asked to learn more about their learning styles. The colleague responded that learning styles have dismissed the approved curriculum's learning-styles component as having "little scientific support." Associate Dean deferred the proposal to Supervisor for discussion with both specialists.

116. On June 6, 2025, Supervisor, already meeting with the colleague, summoned Professor Zhang into an impromptu Teams meeting and ordered her to "cross review" his advising reports. Professor Zhang offered to take responsibility for another department. Supervisor rejected that alternative and insisted on her agreement during the meeting. Professor Zhang asked that student need first be verified with military representatives.

117. On June 9, 2025, Professor Zhang emailed the Associate Dean, Supervisor, and colleague, copying Dean. She stated that no request for additional advising "perspectives" had been raised in the MCR, ACR, or sensing sessions, or by students, team leaders, chairs, or MLIs. She asked that the unidentified request receive the same consideration as other student requests and questioned whether assigning multiple specialists to one student would create the conflicting views Supervisor said she wanted to avoid.

118. On June 9, 2025, hours later, Supervisor emailed Professor Zhang, the Associate Dean, the colleague, and Dean and converted the June 6 cross-review order into a standing written cross-advising policy. The email stated that students were not limited to one SLS specialist. The policy required Professor Zhang to advise the colleague's students on top of her own caseload.

119. On June 9, 2025, that evening, The Associate Dean endorsed Supervisor's summary, replying, "I think you captured everything."

120. On June 23, 2025, Professor Zhang called Dean. She explained that blanket cross-advising could delay support and confuse at-risk students in a tight improvement window. She welcomed students seeking extra help but opposed requiring successive advisors without clear accountability. Dean withdrew the cross-review requirement. She explained the matter was a one-time request from a military unit representative about the colleague. No directive required cross-cover or cross-review, and no chair request or performance concern involved her. Dean acknowledged chair concerns about the colleague's copied reports.

121. On July 1, 2025, Supervisor proposed in writing that both specialists "follow the tracker template that Hang developed," noting that Professor Zhang "already has the tracker working for her departments." The colleague replied that he would need Professor Zhang to "refresh [his] memory" of the tracker he had rejected in April.

122. On July 2, 2025, in a grammar meeting, the white male colleague repeatedly refused to adopt the comparative curriculum endorsed by the Associate Dean, Deputy Dean, and Chief MLIs. It teaches the aspects of English grammar that accelerate Russian study. Professor Zhang stated, based on her observation and student feedback, that it best served grammar acquisition and that the first module must prepare students for the Russian grammar module. Military and academic leaders collectively rejected his legacy generic approach as unrelated to Russian and confusing to students.

123. On July 9, 2025, Professor Zhang also reported that the colleague had not complied with curriculum directives since January 2025 and that his practices "may adversely affect overall URU production." Dean replied that she would follow up with Supervisor. No corrective action followed.

124. On July 9, 2025, Professor Zhang emailed Dean a summary of their meeting on June 23.

125. On July 9, 2025, Dean agreed in writing with the summary and that there were no performance concerns and no complaints from chairs about Professor Zhang.

126. On July 11, 2025, Professor Zhang asked Supervisor in writing to identify which chairs or team leaders had submitted requests, when they had submitted them, and what assistance was requested. She explained that written particulars would improve efficiency and avoid miscommunication or interruptions during instruction and advising.

127. On July 14, 2025, Supervisor replied that she was attending a three-week training and would follow up after returning to the office. She did not identify the requesting chairs or team leaders, the dates, or the assistance requested.

128. On July 14, 2025, Professor Zhang supplemented her EEO complaint to challenge discriminatory, retaliatory assignment to her of compulsory remediation of the white male colleague's work, and Supervisor's treatment of his copied advising reports as a collective "team issue." She also reported that Dean and Associate Provost had not addressed her complaint about selective public treatment by Supervisor.

***Phase VI: Defendant Punishes Professor Zhang for Reporting Duplicated Student Advising Records and Curriculum Violations by Mandatory Meeting, Impossible Orders and "Unethical" Labelling***

129. On July 15, 2025, Professor Zhang resent the third supplement to the EEO mailbox.

130. On July 17, 2025, Professor Zhang emailed Dean and Associate Provost requesting corrective action. She stated that the colleague sought to eliminate all but one of the tracker's categories; that his duplicated reports had been documented by supervisors, a department chair, and Professor Zhang; and that duplicated records undermined monitoring of individualized student support. She requested an update on curriculum compliance and reported had not substantive supervisory input.

131. In June and July 2025, following June 6 cross-review order, Professor Zhang tried to review the colleague's reports in the SharePoint. His duplicated reports disappeared. She moved her reports out of the open folder and later, with the Associate Dean's permission, placed the complete set in a shared group with the relevant MLIs, Supervisor, and the Associate Dean. Every report remained in Defendant's possession.

132. Professor Zhang kept delivering every report on time by email to students, MLIs, team leaders, and chairs. Everyone entitled to her reports received them. When Dean's July 28 directive required uploads to the shared folder, it was locked. Supervisor admitted this on November 28, 2025 without saying when, who, how, or why.

133. On July 17, 2025, 3 days after her July 14 supplement and hours after her report, Dean, copying AP, characterized Professor Zhang's reporting earlier same day as "unethical" and "without any evidence."

a. asserted that Zhang's report was devoid of evidence of the colleague's duplicated reports without identifying the basis of her certainty around when those reports were no longer visible on SharePoint.

b. accused Zhang of failing the Professional Conduct standard, contradicting her own earlier acknowledgment of the colleague's duplication issue, and wrote that she could not discuss another colleague's performance with Zhang.

c. accused Professor Zhang of working fewer departments despite Professor Zhang's offers while accusing Zhang of duplicating two reports without identifying them.

d. Contradicting her previous instruction, Dean stated that she had never approved Professor Zhang's tracker yet insisted on merging it with "existing trackers." No existing tracker had been identified or supplied. Merging risked discipline for incorporating an unapproved tracker; refusing risked a disobedience charge.

e. Stated chair complained about Zhang's 2 reports, contradicting her own July 9 confirmation no chair complaints.

134. On July 18, 2025, Professor Zhang reported to AP the colleague's persistent noncompliance with the curriculum, and that the resulting demands reduced the SLS time and resources available for supporting students at risk.

135. On July 23, 2025, 9 days after her July 14 supplement, which named AP, Professor Zhang raised the curriculum, advising record, and tracker concerns with AP in a Teams meeting. AP ordered her to meet regularly with the colleague but allowed him to keep his own tracker despite military requirement for uniform tracking. AP also told Zhang to

improve the colleague's elective attendance. Dean formalized the meeting requirement in writing on July 28.

136. On July 28, 2025, Dean met with both SLS Specialists and personally issued written directives that adopted AP's instructions:

a. Both must use standardized English Grammar slides. Zhang already did but the colleague had never done. His noncompliance was later confirmed by the Associate Dean's and Supervisor's classroom observations and his own admissions in November 2025 and April 2026.

b. Zhang, a female employee, must meet biweekly and alone with the white male Specialist whose duplication and non-compliance she had reported, with no supervisor, no agenda, objective, or required product.

c. Zhang must validate the colleague's curriculum, which the Deputy Dean, Associate Dean and Chief MLIs had already rejected, against her academic convictions and concerns for students.

d. Both must upload advising reports regularly, although the white male colleague did not comply, as he openly admitted in April 2026. His reports also disappeared from SharePoint during this period.

137. The directive was silent on the tracker, preserving AP's exception for the colleague despite the uniform-tracking requirement by military.

138. Despite the imposed requirement above, Zhang made a good-faith effort to communicate with the colleague and reviewed his proposed curriculum changes. The colleague suggested meeting upon Supervisor's return. Later, his account of Zhang's alleged "failure" to meet became a ground for disciplining her in September.

139. On July 28, 2025, The Inspector General required Professor Zhang to answer a 47-question interrogatory concerning her report of duplicated advising records, student harm, and waste of government resources.

140. Zhang repeatedly raised concerns about lack of individualized advising, academic jeopardy for at-risk students, lack of curriculum compliance, and obstruction of

effective student performance tracking. Zhang reported duplicated advising records documented by supervisors and chairs but left uncorrected. She requested corrective training or supervisory review and reported the colleague's attempt to revert to generic approach harming students.

141. Throughout June–July, Zhang advocated individualized advising, comparative curriculum and tracking that benefit students and warned against duplicated reports, diversion from approved curriculum and neglecting individual learning styles that harm students. Her speech concerned academic integrity, curriculum standards, and teaching. Officials responded with the Dean's July 17 "unethical" accusation and the July 23 and July 28 coordination orders.

***Phase VII: After Professor Zhang Takes Her Reports Outside the Chain, Administrators Expose Her Identity, Restrict Her Student Contact, Investigate Her, and Threaten Removal***

142. On July 29, 2025, Professor Zhang again raised these matters in her formal EEO filing. She expressly alleged race- and sex-based disparate treatment, including additional work imposed on her to remediate the colleague's noncompliance, suppression of her tracker authorship, and management's failure to hold him accountable for copied advising reports. The filing also described her July report to Dean and Dean's later assertion that there was no evidence of complaints about his false advising reports.

143. On July 29, 2025, Professor Zhang reported duplicated advising records documented by supervisors and chairs but left uncorrected, and their harm to students to the Chief of Staff, outside her academic chain of command. The report concerned academic integrity, student careers, federal resources, and the DLI mission. Chief requested her appraisal.

144. On August 18, 2025, the EEO office acknowledged receipt of the filing and notified the officials whose conduct Zhang's filings challenged, including Dean and Supervisor. The notification and routing records are in DLI's possession. The filing identified the colleague through his position, advising reports, tracker-related conduct, misconduct, and

management's unequal response, and the work Zhang was required to perform over his noncompliance.

145. On August 20, 2025, after repeated reports on the duplicated advising records and management's failure to correct them, Zhang sent her appraisal to the Chief of Staff at his insistence.

146. Within 20 minutes, the Chief of Staff disclosed Zhang's identity as the reporter to her Dean, Associate Provost, Provost and Assistant Commandant, writing that "different students are apparently receiving identical reports" through "a cut-and-paste approach by supervisors that may be harming student production." Zhang had not consented to the disclosure.

147. On August 21, 2025, the day after the Chief of Staff's disclosure, Dean prohibited Professor Zhang from contacting students, including at the student club fair, where military leadership had endorsed SLS presence. Direct contact with military students is integral to her specialist responsibilities, including academic advising, diagnosis, and support. The prohibition contradicted Dean's earlier directive of launching a newsletter to increase students' awareness of SLS support. Zhang has received no notice lifting the prohibition.

148. On August 22, 2025, 2 days after Chief's disclosure, Deputy Dean, outside her supervisory chain, initiated an investigation of Professor Zhang based on anonymous student comments preferring non-AI-study strategies, despite overall positive feedback. Commandant publicly encouraged AI use. Zhang now fears proposing technology-assisted teaching or advising methods will trigger further discipline. No notice closing the investigation.

149. On August 22, 2025, Chief subsequently refused to investigate the reported misconduct, despite his own August 20 account of harm to students.

150. On August 25, 2025, Supervisor, copying Dean, first identified the two reports Dean had accused Professor Zhang of duplicating, 87 days after Supervisor's May 30 email and 39 days after Dean's accusation, and 5 days after the Chief of Staff's disclosure. The

reports contained two naming errors among the few hundred reports Professor Zhang produces each year, and she was given no opportunity to correct them. Those 2 reports were the subject of a chair's May 22, 2025 complaint that Supervisor had withheld. Zhang learned of it only on August 25. On July 9, Dean had agreed in writing that there were no chair complaints about Zhang.

151. August 27, 2025, IG closed the investigation concerning the colleague's duplicated advising reports, academic fraud, and administrative cover-ups.

152. On August 31, 2025, Zhang amended her EEO complaint. The amendment challenged Dean's July "unethical" accusation, the meeting directives imposed without an agenda, the denial of credit for her tracker, and the failure of Dean, the Associate Provost, and Supervisor to correct the colleague's copied advising reports.

153. On September 9, 2025, 9 days after Zhang's August EEO filing, 20 days after the Chief's disclosure and 22 days after EEO's notification to both, Supervisor invoked Dean's July 28 directives and issued Zhang's first written counseling in her 23-year federal career. Supervisor charged her with failing to comply with supervisory and Dean directives concerning meetings and advising reports:

a. alleged failure to "promote the efficiency of the service" as the main reason for removal threats.
b. did not identify any policy violation or any prior investigation, or any opportunity to cure.
c. alleged Zhang did not attend biweekly meetings, although the colleague had proposed to meet upon Supervisor's return and the directive left the first meeting to a day and time both parties agreed on. The accusation relied solely on his account. Zhang was never notified nor consulted.
d. alleged missing uploads by Zhang, although Supervisor admitted later in November the folders were locked. The colleague repeatedly admitted he never uploaded.

e. stated that her "failure to follow my instructions, as well as those of Dean, will not be condoned or tolerated," and warned of "penalties ranging from formal reprimand, suspension to removal from Federal service." It remains in DLI records and has not been rescinded.

f. made stigmatizing mental health references, without identifying a previously documented concern. In April 2025, Dean had entrusted Zhang with conducting suicide-prevention training for all 9 school departments.

g. The letter identified no disruption of operations.

154. The white male colleague, bound by the same July 28 requirements, received no comparable counseling, removal-level warning, or discipline for his curriculum non-compliance, failure to meet, failure to upload and failure to provide individualized reports.

155. The Dean directives enforced in the letter conflicted with command policy. They required Zhang to validate the colleague's curriculum, which military officials had already rejected, and let him keep his own tracker despite the uniform-tracking requirement. Compliance meant violating command policy; noncompliance meant discipline.

156. On September 11, 2025, Professor Zhang reported the duplicated reports and misconduct to the Commandant but received no response.

157. On September 12, 2025, Professor Zhang received a 148-page declaration/interrogatory from DoD investigator (different from the first investigator in 2024), with a 72-hours deadline and no live interview. Professor Zhang asked in writing why live interviews had been removed departing from previous procedure and who was responsible for procedural changes and questions. Investigator refused to answer or identify a point of contact.

158. On September 12, 2025, Agency Counsel was copied on Investigator Thurber's email correspondence despite the EEO director's prior statements that Counsel should not participate, as already a witness and a named party in this EEO investigation.

159. Following Zhang's attempt to contact the Commandant, Defendant changed Commandant's open-door policy and required all grievances to be routed through the Assistant Commandant.

***Phase VIII: Defendant Continues Disciplinary Threats, Manipulates Her Appraisal, and Escalates Unequal Workload and Scrutiny***

160. On October 3, 2025, Professor Zhang raised the September 9 counseling letter with the EEO office, 24 days after it issued.

161. October 17, 2025, during furlough, Dean again made stigmatizing mental health references and threatened a police welfare check in an email publicly to school administrators and colleagues. Dean had repeatedly used mental-health stigma and unethical labeling.

162. On Oct 22, 2025, Supervisor suddenly announced a class observation, giving Zhang 1 day to prepare for a class twice the size of the colleague's. The colleague was given 2 days to prepare.

163. On November 12, 2025, Zhang submitted a written rebuttal to the September 9 counseling letter. She challenged the meeting and upload accusations, the lack of clear standards or corrective feedback, and the unequal enforcement of directives imposed on both specialists. She emphasized her compliance with the endorsed curriculum, the colleague's unaddressed noncompliance, and the removal threat issued without progressive discipline.

164. On November 28, 2025, at the first counseling meeting, 80 days after the letter, Supervisor told Professor Zhang directly that Dean had instructed Supervisor on the counseling letter. On May 2, 2026, former Supervisor Chen told the EEO counselor that she issued the letter following Dean's guidance (EEO report).

165. During the counseling meeting, Supervisor made at least 14 statements that contradicted documentary evidence, prior emails, or her own statements, including that:

a. She gave three incompatible accounts of cross-review: she never ordered it, it was a one-time matter, and an ongoing policy consistent with the June 9 email.

b. The SharePoint folders had been locked, but she could not say when, why, by whom, or on what authority.

c. She denied the duplicated-report problem despite her own May 30 email referring to “identical contents” and prior chair complaints.

d. The counseling letter converted Dean’s narrower reference to “ILS classes” into a broader directive on “SLS duties.” Confronted with the difference, she said she saw none.

e. No IDP meeting, initial performance-planning meeting, or written performance standards had occurred in the 10 months before the first removal-level discipline.

f. She consulted Dean about the letter and said she always followed Dean’s orders. The letter likewise stated that Dean’s and her orders must be obeyed.

g. She knew of the Commandant’s May Award and Coin but did not explain why they were held for almost 7 months.

h. She did not correct or intervene in Deputy Dean’s investigation because she did not believe it, confirming Zhang’s reports recommending a variety of strategies beyond AI-assisted ones.

166. On December 5, 2025, Zhang convened an English Grammar meeting pursuant to Dean’s coordination directive. Supervisor, Associate Dean and Chief MLI confirmed, through class observations, that Zhang used the required standardized slides and the male comparator did not. They again directed Zhang to ensure students received the same resources, although she had no supervisory authority over him.

167. Professor Zhang learned through an appointment announcement that she was rejected for the Institutional Evaluator position, **the 7th rejection** she was qualified for. She received no rejection letter. She amended her EEO complaint to include this rejection.

168. In December 2025 – Zhang received the Commandant’s recognition due in May 2025. Supervisor had known of it but had not informed her.

169. On December 18, 2025, Supervisor retroactively redefined the “standardized slides” referenced in Dean’s July 28 email. She identified the SLS legacy materials as Dean’s

intended standard, which only the male comparator supposedly employed. Zhang had never been issued any legacy slides and Dean never specified which version of the several legacy decks constituted the school standard. Supervisor stated she was still seeking Chief MLI's input although Chief MLI, along with Deputy Dean and Associate Dean, already endorsed comparative slides a year earlier at the grammar meeting attended by Supervisor.

170. On January 22, 2026, Supervisor asked Zhang and the comparator to submit the slides each was using. That solicitation made it look as though the standard was still being determined months after Zhang had been disciplined for failing to coordinate around it in September 2025.

171. On March 5, 2026, Supervisor did not nominate Zhang for the $10,000 award, an award nominated based on management discretion alone despite her rating of 5 in the previous year and multiple commandant's awards and coin.

172. On March 6, 2026, Supervisor announced her sudden departure to a different organization, "she was just informed of the transfer," and left the supervisory and rating chain unclear.

173. One hour later, Supervisor made an email announcement and reinstated the English Grammar curriculum standards as the comparative curriculum set, as confirmed by the Chief MLI. Zhang had previously been disciplined for failing to meet with the white male colleague to ensure his compliance. The colleague was never disciplined for openly and repeatedly defying curriculum standards.

174. Defendant, not Zhang, disrupted instruction and student support. Administrators reversed curriculum and academic standards repeatedly from July 2025 to August 2026, tolerated the colleague's duplicated advising reports for more than 3 years, and left students without individualized advising. Counsel's December 31 dissemination and February 7 transmission diverted Zhang's working hours to answering legal jeopardy while she was receiving 3 new classes and graduating 4 others. No administrator has identified any disruption caused by Zhang's reports.

***Phase IX: Continuing Injury: The Letter, the Investigation, Counsel's Dissemination Directive, and the Forced Possession of Privileged Material Remain, Under the Same Officials***

175. Administrators never filled Supervisor's Academic Specialist position and never clarified Zhang's chain of command until her inquiry. Management refused to specify the nature of supervisor's transfer. Dean later characterized it as "detail" in a public letter.

176. On March 20, 2026, Professor Zhang asked the new Associate Provost to identify her supervisory chain and rating authority. The new Associate Provost referred her to Dean and Deputy Dean. Dean stated that Supervisor Chen would remain her rater despite the transfer.

177. On April 27, 2026, at a meeting with the Assistant Dean, now supervisor of both SLS specialists, the white male SLS Specialist stated that he did not use the standardized curriculum, upload advising reports, or maintain the uniform tracker. The September 9 counseling letter had disciplined Zhang for these categories. The colleague received no counseling, removal-level warning, investigation, or adverse performance consequences.

178. In May 2026, during the following appraisal meeting, former Supervisor Chen cited an anonymous department chair's complaint about the varying length of Zhang's advising reports to justify a downgraded rating already decided. She supplied no specific examples or explanation of how the complaint affected the rating. Zhang had received no such requirement or feedback. Her reports varied according to individual student needs, consistent with Command policy. Her presentation illustrating that approach on "a portable study plan" was accepted for an institute conference.

179. In May 2026, the colleague again proposed altering the English Grammar course structure by cross-teaching between the two specialists. Professor Zhang explained this would fracture teaching team scheduling and interfere with acquisition. The Chief MLI and Assistant Dean rejected his proposal.

180. In May 2026, former Supervisor Chen restored a rating of 5 in her written appraisal.

181. On May 26, 2026, Dean participated in the EEO investigation of Professor Zhang's complaint. Dean had known of that activity since at least the EEO office's August 18, 2025 notice.

182. On June 3, 2026, EEO Office informed it received Zhang's formal complaint electronically. June 8, 2026, EEO office "deemed" the complaint filed.

183. In and around June 2026, Dean lowered Professor Zhang's appraisal, producing an overall rating of 4.3 despite Supervisor's rating of 5.

184. On July 24, 2026, During the DPMAP meeting, the Assistant Dean stated that 1) Supervisor had rated of 5 on all elements, 2) Dean had assigned a rating of 3, and that 3) the resulting overall rating was 4.3. Professor Zhang did not receive a within-grade step increase and sought clarification of the rating decision.

185. On August 10, 2026, Dean wrote, "Your DPMAP rating was done by me."

186. On August 25, 2026, Dean instead wrote, "Your DPMAP rating was done by Dr. Chen."

187. Dean described the final overall rating as 5 and attributed it to "management's evaluation." She did not reconcile that account with the July 24 description of her rating of 3 and an overall rating of 4.3, or her conflicting statements identifying herself and Dr. Chen as the rating official.

188. Dean did not identify the respective roles of the immediate supervisor and Dean. The rating chain remains internally inconsistent. The rating affected Zhang's within-grade step increase. Dean never identified the anonymous complaint or gave any feedback.

189. In August 2026, Defendant transferred the white male Specialist from URU to the Chinese school, leaving the Russian school, DLI's largest and a military priority language, with one specialist and no replacement. Dean assigned Zhang as the sole SLS Specialist for five departments, comprising of over half of her school, about 460–480 students annually in 30 instructional teams. The workload remains in effect.

190. In his new post with the same job title, the white male Specialist carries about 1/3 to 1/5 of Professor Zhang's caseload. His school had already had one SLS specialist and at least two Academic Specialists.

191. In August 2026, Dean publicly recognized two collateral-duty faculty members for advising support. Zhang was not despite carrying the largest SLS caseload in DLI.

192. On August 6, 2026, after Defendant transferred the male specialist, the Assistant Dean and the Deputy Dean held a meeting and restored the standardized student tracking system that Zhang had developed. Dean had maintained she never approved it despite her tracker-merging order.

193. At the same meeting, administrators reaffirmed the standard English Grammar and Learning Strategies curricula, which Professor Zhang had followed throughout. Administrators directed their continued use. The comparator had previously ridiculed Professor Zhang's teaching of Learning Style from the official curriculum as "pseudoscience."

194. Because administrators require both specialists' students to receive the same materials, Zhang no longer recommends additional learning resources she has found effective, fearing a charge of disobeying that directive. The counseling letter remains in her file and will be considered in future appraisals and promotion decisions. She fears further investigations and appraisal manipulation when she teaches and advises according to her expertise and students' needs, and fears that repeated investigations will spread knowledge of her EEO activity. She therefore avoids mentioning technology with students for fear of another investigation, and does not invite colleagues to collaborate on research for fear that Dean would retaliate against them.

195. On August 11, 2026, the colleague stated, "Although I thought I had, apparently I did not advise anyone from Dept A this year." After Professor Zhang assumed responsibility for Department A in April 2026, she found that 4 of its students, already approaching graduation, had received no advising from the colleague during the year.

196. On September 15, 2026, EEO investigation accepted the rating manipulation.

197. On September 21, October 7, and October 13, 2026, after Professor Zhang assumed responsibility for Department B in August 2026, she attended Attrition Boards for six of its students. For none of those students did the shared folders contain an advising report from the colleague.

198. Upon examining the colleague's handovers, Professor Zhang found that through at least March 2026, the colleague's advising reports for different students continued to largely consist of the same pasted strategy instructions, with little individual tailoring. This was the practice department chairs had complained of, as shown to her in 2024. No administrator corrected it.

199. In September and October 2026, after Defendant transferred the SLS comparator, Dean imposed three school-specific requirements on Professor Zhang: is now submission of her students' names for 2026 appraisal and tracking of every future advisee (2) immediate student feedback after each instructional session; and (3) student signatures on every advising report. The new UGE performance standards required none of these. The standard UGE advising form contains no student-signature block. Dean never imposed these requirements while the white male Specialist held the position. The comparator was not required to submit his trackers, collect immediate feedback, or obtain student signatures. For her 2026 appraisal, Professor Zhang submitted trackers listing all her students. The comparator still has not submitted many of his advising reports.

200. Zhang has received no notice that the September 9 letter was rescinded, and no notice that the investigation has closed. The student contact restriction and core speech remain in force, as does the workload administrators imposed.

201. AP, who testified that he knew of Zhang's EEO activity and discussed it with senior administrators, handled her matters together with Dean from her April 2025 appraisal complaint onward. Both, already aware of her EEO activity, received the Chief of Staff's August 20 email.

202. Counsel's December 31, 2024 email did not merely report Professor Zhang's EEO activity. Counsel urged senior administrators to keep disseminating her EEO status and to treat her protected activity as a "mechanism" to be "mitigated." The Chief of Staff's August 20, 2025 disclosure acted on that urging. That coordinated retaliation continues to affect Professor Zhang.

203. The TDA on which Defendant (including former AP Gajdos) claimed to rely, containing designations that did not exist, has never been corrected. The TDA remains DLI's operative record of Professor Zhang's designations and continues to be relied upon in proceedings concerning her assignment, depriving her of an accurate record.

204. Professor Zhang protested the February 7, 2025 unauthorized transmission to officials including the Supervisory Attorney. No corrective action followed. The Supervisory Attorney continues to receive and participate in DLI's handling of Professor Zhang's EEO complaints. Professor Zhang's complaints therefore remain routed through an official with knowledge of the uncured transmission.

205. Professor Zhang reported Dean's and former Supervisor Chen's failure to correct noncompliance. Dean remains her senior rater. After the fact, both collected minor comments about her work to justify the appraisal downgrade and discipline. Dean retains authority to do so again. Former Supervisor Chen, whom Defendant detailed, regains that authority upon return.

206. Professor Zhang's specialist responsibilities require direct contact with assigned military students, including academic diagnosis, individual advising, instructional intervention, and academic support. Dean's August 21, 2025 restriction on her student contact continues to impair her direct advising, diagnosis, and student support.

***Phase X: Defendant's Actions Deprived Professor Zhang of Her Rights, Causing Financial, Emotional, and Reputational Damage.***

207. The principal events described above, including Zhang's reassignment and dual workload, compelled cross-review and curriculum coordination, contradictory directives, September counseling letter, force possession of unsolicited privileged material,

and appraisal manipulations, were not isolated. These interconnected actions support overlapping claims of discrimination, retaliation, hostile work environment, interference with protected academic expression, and deprivation of procedural due process. The same events involved multiple officials, affected different protected interests, and produced cumulative and continuing injuries.

208. Professor Zhang has suffered financial loss, including withheld within-grade step increases; reputational injury; and significant emotional distress and deterioration in her health. Her sharply increased workload, 460–480 students across five departments, combined with the unresolved investigation, continuing threat of discipline or removal, restriction on her academic speech about the best strategies for students, curtailing of her student contact, and repeated after-the-fact reliance on anonymous complaints, continues that harm. Professional isolation and fear of further investigations and downgrading leave her career and livelihood uncertain.

**COUNT I**

**FIRST AMENDMENT RETALIATION**

**(Declaratory and prospective relief, 5 U.S.C. § 702)**

209. Professor Zhang incorporates each preceding allegation.

210. From 2023 through 2026, Professor Zhang repeatedly and persistently spoke against academic misconduct at DLI. That misconduct included duplicated advising records left uncorrected, departures from approved curricula and student tracking, harm to military students, waste of federal resources, discrimination in assignments and selections, and the agency's handling of her reports. The speech in this Count illustrates that course and does not limit it.

***Role and Reporting***

211. Professor Zhang is a civilian academic faculty member. Her functions are teaching, curriculum development, and student advising. The speech at issue concerns academic expertise and institutional accountability.

212. From June through August 2025, Zhang reported duplicated advising records documented by supervisors and chairs but left uncorrected. She reported departures from approved curricula and tracking practices. Both went to her Supervisor, the Dean, the Associate Provost, and the Chief of Staff. Those reports addressed practices under the Dean's oversight, including the Dean's handling of the colleague's duplicated reports. On July 17, 2025, the Dean called her reporting "unethical." Zhang continued to report.

213. On July 29, 2025, Zhang reported these concerns to the Chief of Staff, outside her academic chain of command. The Chief of Staff requested her appraisal. On August 20, she sent it. The Chief of Staff disclosed her identity as the reporting employee to senior administrators.

***A. Professor Zhang Engaged in Protected Speech on Matters of Public Concern***

214. Professor Zhang spoke on matters of public concern in three categories: (a) teaching and pedagogy, including her objections to reversing curriculum standards and to the removal of student-progress tracking; (b) academic governance, including her objections to colleagues' duplicated reports that harmed students; and (c) reports of misconduct to EEO, the Inspector General, and command channels.

215. This speech concerned academic standards, the quality of instruction, and the integrity of institutional reporting. DLI is a federally funded institution that trains military linguists for national-security assignments. She challenged administrators' refusal to investigate fraud, the disclosure of confidential whistleblower information, the discriminatory use of "operational need," and procedural irregularities affecting federal programs and military students.

216. Professor Zhang's teaching and governance speech is academic speech. Her methods were leadership-approved, student-praised, and aligned with institutional goals. Teaching and academic writing by public-university faculty are analyzed under Pickering.

217. Professor Zhang's reports to EEO, the Inspector General, and command went outside her chain of command to bodies charged with investigating the conduct reported. Reporting fraud and discrimination to oversight bodies was not among her responsibilities.

218. Curriculum is program design, not daily operation. Her curriculum work concerns which grammar curriculum the departments use, how student progress is tracked across a course, and how advising responds to students at risk of failure. These decisions govern programs across multiple inputs. Academic leadership supported the standardized grammar curriculum, advising tracking, individualized report, learning styles, etc.

***B. Agency Counsel Urged Top Management to Disseminate Professor Zhang's EEO Status and to "Mitigate" Her December 31, 2024 Speech as a "Mechanism"***

219. On November 27, she asked the Dean of Students in writing for his strategic plans and initiatives aligned with the Commandant's Strategic Plan, a one-page memo. No response came. On December 31, 2024, she wrote to high-level administrators. She asked for "information about the strategic plans and initiatives aligned with the Commandant's Strategic Plan" and "clarity on . . . how faculty feedback is addressed." She asked that faculty inquiries be treated with equal respect "regardless of any non-meritorious characteristics."

220. The message also sought institutional accountability. She asked whether the Dean of Students had implemented the Commandant's Strategic Plan, putting that question to high-level administrators above the Dean of Students and the middle management whose implementation of Command policy it questioned. The message concerned Command compliance and instructional integrity, matters of public concern independent of her personal employment circumstances. To the extent it concerned how faculty implement instructional direction, it is teaching-related speech. Her assigned duties were teaching, curriculum implementation, and advising. She was not employed to question whether the Dean of Students had implemented Command policy, or to advocate for equal treatment.

221. The agency immediately forwarded the message to Agency Counsel without responding to her. Agency Counsel characterized her as "using EEO as a mechanism," urged leadership to "mitigate," and disseminated her EEO status to senior officials. It treated the complaint as protected EEO activity requiring containment. Agencies do not send routine job communications to counsel.

222. After December 31, the agency treated Zhang as a litigation threat requiring containment.

223. On January 16, 2025, Agency Counsel stated in writing that recipients of Counsel's December 31 directive were likely to be called as witnesses. That statement confirms the December 31 directive existed, was deliberate, and its recipient knew of Zhang's EEO activity.

***C. Defendant Subjected Professor Zhang to Adverse Actions That Would Chill a Person of Ordinary Firmness***

224. The September 9, 2025 counseling letter threatened removal, termination, and demotion. It was the first discipline of her 23-year career, without precedent in her service record. It issued without progressive discipline and without any opportunity for her to respond.

225. The letter was part of a series of adverse actions before and after it: the prohibition on student contact; an investigation never formally closed; the public rescission of an announced award; stigmatizing mental-health references; manipulated appraisals in 2024 and 2026; withheld within-grade step increases in 2024 and 2026; repeated non-selections despite her qualifications; impossible and conflicting directives; record manipulation; government-manufactured disciplinary jeopardy; and her non-nomination for the 2025 Outstanding Civilian Recognition Program award.

226. Defendant recognized Zhang's contributions while conditioning her standing on her silence. Defendant required her to adopt reversed curriculum standards, to validate the colleague's duplicated reports, and to stop reporting misconduct.

227. Defendant has never notified Zhang that the September 9 letter was rescinded or that the related investigation was closed. The letter remains in her personnel file. The letter warns that Zhang's "failure to follow my instructions, as well as those of Dean, will not be condoned or tolerated." It threatens "penalties ranging from formal reprimand, suspension to removal from Federal service." That warning remains in effect.

***D. Protected Speech Was a Substantial or Motivating Factor***

228. Officials who took the adverse actions knew of her protected activity, including through Agency Counsel's December 31 directive to top management and the Chief of Staff's disclosure of her identity. Defendant characterized her EEO activity as a "mechanism" requiring "mitigation." That language, with the coordinated response and the inconsistent explanations, supports an inference of retaliatory motive.

229. The principal adverse actions followed her protected speech within days to weeks.

***E. Defendant Punished Professor Zhang for Reporting Duplicated Advising Records and Management's Failure to Correct Them***

230. Officials who knew of her protected activity imposed the coordination obligation, memorialized it, and enforced it through discipline. The September 9 letter was the product of coordinated action. Zhang's protected activity was a substantial or motivating factor.

***F. The Asserted Justification Was Pretextual***

231. Defendant has offered no reason that survives its own records: no performance concern, no chair complaint, no disruption. The grounds it later asserted surfaced only after her reports. They shielded the colleague and the officials she reported. Zhang advocated curricula already endorsed by academic and military leadership and opposed departures that leadership had rejected. Defendant's stated reasons are pretextual.

***G. No Disruption: Pickering Favors Professor Zhang***

232. Pickering balancing is the government's burden. Zhang raised her concerns through the Inspector General, EEO, and senior officials. She did not disrupt any class. She kept performing all her duties throughout. Her reports disrupted no class, schedule, or mission function. Defendant has never identified any disruption, inefficiency, or harm to the military mission caused by her speech. Defendant's own repeated reversals of curriculum and academic standards, not her reports, disrupted instruction.

233. Professor Zhang received four Commandant's Awards and a Commandant's Coin from 2024 to 2026.

234. Defendant disciplined her for following the curriculum its own military and academic leadership endorsed and restored.

***H. Continuing Injury and Relief***

235. After Defendant transferred the colleague, Dean and other administrators appointed no replacement. They assigned Zhang sole responsibility for five departments, comprising of over half of her school, 460–480 students annually in 30 instructional teams. That workload followed her repeated objections to inadequate student support and unequal enforcement of standards.

236. Among the officials who rate, supervise, and investigate Zhang's academic work are officials whose practices she questioned in her protected reports, including the Dean's handling of the colleague's duplicated reports. They exercise that authority while the investigation remains open and the September 9 letter remains in her file. Anonymous criticism of the format of her advising reports has been used to challenge her performance. As a result, she diverts time from curriculum improvement, instruction, and individualized student support to monitoring minor comments, withholds recommendations involving instructional innovation, and exercises heightened caution in advising. That restraint on her independent academic judgment is present and ongoing. It does not depend on any future act by Defendant.

237. Despite the Commandant's awards, Zhang cannot know whether Defendant will downgrade, discipline, or remove her. The threat has already recurred. After the letter, Dean and Supervisor manipulated the appraisal process again in 2026. In September and October 2026, Dean, imposed new requirements on Zhang alone. The investigation has never been formally closed. Her within-grade step increases for 2024 and 2026 remain withheld. That unresolved threat, hanging over a career of more than 23 years, is a present constitutional injury.

238. Professor Zhang has no adequate legal, administrative, or other remedy to prevent this continuing harm. On this Count she seeks only declaratory and prospective injunctive relief, for which 5 U.S.C. § 702 waives sovereign immunity, and no damages. Without declaratory and injunctive relief, Defendant's actions will continue and she will suffer irreparable harm.

**COUNT II**

**VIOLATION OF FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS**

**(Against Defendant in His Official Capacity; Declaratory and Injunctive Relief; 5 U.S.C. § 702)**

239. Professor Zhang incorporates each preceding allegation.

240. This Count does not challenge the adequacy or timeliness of any EEO investigation. This Count challenges the design and operation of the process through which Defendant deprived Professor Zhang of protected interests: government-created jeopardy, structural bias, record manipulation, and official stigmatization without neutral adjudication.

***A. FEBRUARY 7 UNAUTHORIZED TRANSMISSION: GOVERNMENT-CREATED JEOPARDY AND REFUSAL TO CURE***

241. Counsel's unsolicited February 7 unauthorized transmission placed Professor Zhang in forced possession of privileged material she was not authorized to receive. Zhang promptly reported the transmission in four forums and requested retrieval, handling instructions, and assurance against discipline. Defendant refused each request.

242. No forum addressed the transmission or Zhang's resulting exposure to discipline. Defendant has supplied no corrective determination.

243. The transmission and its aftermath violated due process because (a) Defendant manufactured jeopardy by placing privileged material in Zhang's possession; (b) Defendant refused to cure after notice in four forums; and (c) those forums then relied on tainted process. The private interest is her career and continued employment; the risk of erroneous

deprivation from a trap the government refuses to cure is high; and the government's burden, a retrieval or handling instruction, is negligible.

***B. PROFESSOR ZHANG WAS DEPRIVED OF PROTECTED PROPERTY AND LIBERTY INTERESTS WITHOUT CONSTITUTIONALLY ADEQUATE PROCESS***

244. Professor Zhang has held a tenured excepted-service appointment at DLI since 2006 and is removable only for cause. DLI competitively selected her for an institute-level senior Student Learning Specialist position with defined duties and no target-language teaching assignment. DLI's assignment of that position created mutually explicit understandings supporting a property interest in those duties.

245. AP forcibly reassigned Zhang without notice from the institute-level position to a school-level specialist role and wrote 10–15 weekly hours of Chinese language instruction into her performance standards.

246. AP relied on a Table of Distribution and Allowances ("TDA") that was manipulated, that Zhang had no notice would determine her placement, and that she had no opportunity to examine or correct. The manipulated TDA remains uncorrected.

247. The reassignment deprived Zhang of property without due process because (a) she received no pre-deprivation notice; (b) she had no access to the record that determined her placement; and (c) she had no opportunity to correct that record.

248. In the counseling letter, Supervisor threatened removal from federal service. It was the first such letter in Zhang's 23-year career. It issued without progressive discipline, after AP and Dean had confirmed that Zhang had no performance concerns.

249. In 2026, Dean lowered Zhang's appraisal without notice. The rating was later restored, but Zhang has not received the within-grade step increase that the rating governed. A 2024 downgrade by the Former Dean and Previous Supervisor Cyriacks also cost her a within-grade step increase.

***C. STRUCTURAL BIAS AND ROLE COLLISION***

250. Counsel, whose dissemination and transmission Zhang challenged, led the institutional response to her protected activity and remained involved in the review of her

complaints. Dean, whose conduct Zhang reported, accused her, restricted her student contact, guided the counseling letter, participated in the process on her complaint, and remains her senior rater.

251. This structure combined advisory, prosecutorial, and adjudicatory functions because (a) Counsel advised the decisionmakers while coordinating action against Zhang and shaping review of her complaints; (b) Dean accused Zhang, restricted her, guided her discipline, and rates her performance; and (c) no reviewer outside that chain resolved her objections to the counseling letter, the restriction, or the appraisal.

***D. STIGMA-PLUS: OFFICIAL STIGMATIZATION ACCOMPANIED BY ALTERED STATUS***

252. In official communications, Dean called Zhang's reporting "unethical" and accused her of duplicating reports; the Chief of Staff disclosed her reporting status to the officials she had reported; and the counseling letter and Dean's October 2025 email to administrators and colleagues made stigmatizing mental-health references.

253. The accusations are false. They concerned 2 of the 300–350 reports Zhang prepares each year, and no neutral process adjudicated them.

254. Direct contact with assigned military students is integral to Zhang's specialist duties. Dean's student-contact restriction removed that existing function.

255. The stigma accompanied further alterations of status: an investigation initiated without notice and never closed; the removal-level counseling letter, maintained unrescinded; mandatory meetings; denial or delay of recognition; exclusion from mission-critical review meetings and professional opportunities; the manipulated appraisal process and withheld within-grade step increases; and escalation without neutral review.

256. Professor Zhang received no opportunity to answer the basis for the counseling letter before it issued and no name-clearing opportunity.

***E. PROCEDURAL TRAPS***

257. Defendant placed Zhang in procedural traps in which compliance and refusal each exposed her to discipline, including the demand that she disclose the February 7

material, meeting and upload charges while the advising folders were locked, an undefined standard curriculum, and instructions that conflicted with command policy. These traps are set out in Table 5.

***F. MANIPULATION OF RECORDS AND EVIDENTIARY FOUNDATION***

258. Supervisor charged Professor Zhang with defying directives while Defendant withheld what she needed to answer them: the particulars, the underlying reports, and access to the locked advising folders, from which the colleague's reports disappeared and were deleted. Defendant gave contradictory explanations of the directives and the appraisal change and departed from its own investigative procedures.

259. These procedural manipulations raised the risk of erroneous deprivation because (a) decisive records were altered, locked, or deleted; (b) contradictory directives left no fixed standard to meet; and (c) Zhang could not present or test material facts. The process operated to deter, exhaust, and silence rather than to adjudicate.

***G. DENIED SAFEGUARDS AND CONTINUING INJURY***

260. Professor Zhang requested the operative records, particulars of the accusations, the applicable standards, and review by an uninvolved official. Those safeguards would have reduced the risk of erroneous deprivation.

261. These deprivations continue. The student-contact restriction, the open investigation, the unrescinded counseling letter, the manipulated TDA, the uncured February 7 jeopardy, and the withheld within-grade step increases remain, and Zhang's objections remain subject to review by the officials whose conduct she challenged. The harm recurred in 2026, when Dean lowered her appraisal and imposed new requirements on her.

262. Administrative remedies have failed to resolve these violations. On this Count Zhang seeks only declaratory and prospective injunctive relief, for which 5 U.S.C. § 702 waives sovereign immunity, and no damages.

263. This Count does not depend on proof of discriminatory or retaliatory motive.

264. Count II challenges how process was cut off, not why, and complements, rather than duplicates, Counts I and IV.

**COUNT III**

**DISPARATE TREATMENT ON THE BASIS OF SEX, RACE, AND NATIONAL ORIGIN UNDER TITLE VII**

**(42 U.S.C. §§ 2000e-2, 2000e-16)**

265. Professor Zhang incorporates each preceding allegation.

266. Professor Zhang is a Chinese-American woman with a Ph.D. in Linguistics, a member of multiple protected classes under Title VII. She was fully qualified for the positions and assignments at issue. The decisionmakers worked with her directly and knew her race, sex, and national origin, and her applications identified her by name and by her Chinese-language background.

267. Because of her race, sex, and national origin, Defendant subjected Zhang to adverse employment actions, including 7 denials of positions for which she was qualified, a dual teaching workload, lowered appraisals and withheld within-grade step increases, rescinded or delayed recognition, exclusion from professional opportunities, the prohibition on student contact, and a counseling letter that threatened removal.

268. During the 2023 reorganization, the Dean of UKP, a key decisionmaker, repeatedly told Zhang to “go back to Chinese school.” Defendant reassigned her to the Chinese school against all 3 of her requested placements. Regarding that reassignment, the Associate Provost testified under oath, “It doesn’t mean I don’t see that is discriminatory.”

269. Senior administrators referred to female faculty as “a stable of teachers” and admitted that “all leaders at DLI are old white male.” The Chief of Staff stereotyped other races as overly emotional.

270. From 2023 through 2026, white male comparators were treated more favorably in workload, promotions, and assignments, despite lesser qualifications as shown in this table:

| Comparator | Relevant comparison | More favorable treatment |
|---|---|---|
| Dr. Timothy Berndt, Faculty Development Specialist (white male) | Same Faculty Development department under ETD; comparable Chinese-language capability | Retained his preferred assignment;<br>not reassigned to a language school;<br>no teaching load |
| Mr. Michael Gelbman (white male) | Zhang's 2023 reassignment cohort;<br>no Ph.D.;<br>two academic ranks lower | Received his first-choice placement;<br>selected over Zhang for the Test Specialist position |
| The white male Specialist (white male) | The white male Specialist;<br>Same SLS title;<br>no Ph.D.;<br>one academic rank lower;<br>the colleague whose advising and curriculum practices Zhang reported | No discipline for failures involving advising reports, curriculum, uploads, tracking, and meetings;<br>after his transfer, about 1/3 to 1/5 of Zhang's caseload |

271. Management justified the dual workload by a "Chinese teacher shortage," yet imposed the additional uncompensated Chinese teaching only on Chinese female specialists. No white male specialist carried a dual teaching load.

272. The white male Specialist deviated from the endorsed curriculum, uploads, and tracker without discipline or investigation. Yet the counseling letter charged Zhang alone under coordination requirements that applied equally to him.

273. After Zhang reported his noncompliance, Defendant ordered her, a female employee, to meet biweekly and alone with him, and later disciplined her alone on his account only.

274. After Defendant transferred the white male Specialist, Zhang became the sole specialist for five departments with no replacement, carrying about 3 to 5 times his new caseload. Dean then imposed requirements on Zhang that were never imposed while he held the same position.

275. Defendant's shifting explanations for these decisions, including teacher shortage, student preference, and TDA data, were inconsistent and pretextual. Comparator data, selection matrices, and interview records are in Defendant's exclusive control.

276. This Count does not depend on Defendant's knowledge of Zhang's protected activity. Similarly situated employees outside her protected classes were treated more favorably under the same policies. Defendant treated Zhang less favorably because of her race, sex, and national origin.

277. Professor Zhang exhausted administrative remedies through her EEO complaints, amendments, and proceedings. Later acts arose from, or are reasonably related to, matters under administrative review.

**COUNT IV**

**TITLE VII RETALIATION**

**(42 U.S.C. §§ 2000e-3(a), 2000e-16(a))**

278. Professor Zhang incorporates each preceding allegation.

***A. Protected Activity***

279. Professor Zhang requested EEO counseling in May 2023 and filed a formal complaint in June 2023 alleging race, sex, and national-origin discrimination in selections, assignments, and terms of employment. She later requested an EEOC hearing, amended her complaint to retaliation, and pursued that complaint and later complaints through testimony, declarations, amendments, and new filings. She also reported to the Inspector General and objected to confidentiality and dissemination violations in the EEO process.

280. Professor Zhang's December 31, 2024 email was protected opposition and protected speech. Zhang asked for equal treatment of faculty "regardless of any non-meritorious characteristics" and questioned how the Commandant's one-page Strategic Plan was being implemented. Within 1 minute, the Associate Provost routed it to Agency Counsel. Defendant treated the email as protected EEO activity.

281. In her 2025 EEO supplement, filings, and amendment, Zhang opposed selective enforcement based on race and sex, unequal assignment of duties, and the treatment

of a white male Specialist under standards that administrators enforced against her. She identified Supervisor, Dean, and the Associate Provost in connection with those practices, and the EEO office notified Dean and Supervisor of her filing.

282. Professor Zhang also reported duplicated advising records documented by supervisors and chairs but left uncorrected, curriculum irregularities, misuse of public resources, and student harm through supervisory chain, to senior administrators, the Chief of Staff, EEO, and the Inspector General. Those reports opposed selective enforcement on the basis of race and sex: administrators excused the white male Specialist and held Zhang to standards they did not apply to him. These activities are protected under the opposition and participation clauses.

***B. Materially Adverse Actions***

283. After her protected activity, Defendant took the following actions against Zhang:

a. Non-selections. Through December 2025, Zhang was repeatedly denied positions for which she was qualified while her EEO complaints were pending, including at least one selection overseen by the Associate Provost, who knew of her EEO activity.

b. Dual workload. Zhang's Specialist duties were combined with 10–15 additional classroom hours weekly, without added pay, and the assignment continued after she began EEO proceedings. The workload imposed uncompensated labor and cut the time available for advising.

c. Exclusion. Zhang was barred from faculty development sessions, professional development, and strategic planning attended by white male colleagues.

d. Award rescission and delay. DLI rescinded a publicly announced January 2025 award and withheld a later May 2025 recognition, which Supervisor knew was due in May 2025, but which Zhang received only in December 2025.

e. Forced possession of unsolicited privileged material. On February 7, 2025, after urging top management on December 31 to "mitigate" Zhang's EEO activity,

Agency Counsel transmitted to her privileged materials she had neither requested nor been authorized to possess. Defendant refused to cure after notice in 4 forums. Disclosing risked discipline. Withholding risked her case.

f. Cross-review and folder lockout. Supervisor directed Zhang to cross-review the reports she had challenged as duplicated, and Supervisor later admitted the advising folders were locked. Zhang was forced to validate what she had reported and was blocked from the records.

g. Coordination directives. The Associate Provost and Dean made Zhang responsible for a colleague's compliance that she had no authority to compel.

h. Student-contact restriction. Dean prohibited Zhang from contacting students, stripping a core function of the Specialist role and cutting soldiers off from required academic support.

i. Investigation. The Deputy Dean outside of her supervisory chain opened an investigation on anonymous student comments preferring non-AI study strategies, despite overall positive feedback, while the Commandant publicly encouraged AI use. It was the first investigation of Zhang in 23 years, and it has never been closed.

j. Counseling letter. On September 9, 2025, after consulting Dean, Supervisor issued the first removal-level counseling letter of Zhang's 23-year career.

k. Stigmatizing mental-health references. The counseling letter made stigmatizing mental-health references and Dean's October 2025 email threatened police welfare check, although Dean had earlier selected Zhang to conduct suicide-prevention training for all 9 school departments.

l. 2024 appraisal. During Zhang's appraisal meeting, Previous Supervisor Cyriacks told her, "You should not go to EEO." After her EEOC hearing request, Previous Supervisor Cyriacks and the Former Dean downgraded her rating after she signed it, costing her a within-grade step increase.

m. 2026 appraisal. After participating in the investigation of Zhang's EEO complaint, Dean lowered an element former Supervisor Chen had rated 5 to a 3. The rating was later restored, but Zhang has not received her within-grade step increase.

284. The counseling letter charged Zhang with failing to follow meeting and advising-report directives that applied to both Specialists. Administrators excused the other Specialist's departures from those requirements, yet disciplined Zhang alone.

285. Individually and cumulatively, these actions would dissuade a reasonable employee from making or supporting a charge of discrimination.

***C. Causation***

286. Agency Counsel characterized Zhang as "using EEO as a mechanism," urged leadership to "mitigate," and disseminated her EEO status to senior officials. Defendant viewed Zhang herself, not any single communication, as the threat.

287. The Associate Provost testified under oath that he knew of Zhang's EEO proceedings through counsel, that he had communicated her EEO status to the Chief of Staff and the Provost, and that he had "no concerns" about her performance. Dean later called Zhang's report "unethical," and the Chief of Staff disclosed her reporting status to officials involved in the challenged conduct.

288. The principal adverse actions followed rounds of protected activity in close sequence, with escalation after each round.

289. Before December 31, 2024, Zhang's 2022–2023 evaluations rated her "Exceeds Expectations," "Outstanding Model," and "Excels," and she had received awards and Commandant's recognition. In July 2025, Dean agreed in writing that there were no performance concerns and no chair complaints. The adverse actions marked a sharp and unexplained inflection point after her protected activity, with no intervening performance decline. Defendant's later performance rationales are post hoc.

290. The Associate Provost, Dean, and Supervisor operated within the same supervisory chain. Each of them, and the Chief of Staff, knew of Zhang's protected activity

before the principal adverse actions each took or shaped. Her protected EEO activity was a but-for cause of the discipline.

291. The white male Specialist submitted duplicated advising reports for more than 3 years and later admitted failures to upload reports and follow curriculum and tracker requirements, without investigation, counseling, or discipline. Other white male Specialists in the 2023 reassignment cohort also received first-choice placements and exemptions from dual workload, while Zhang was denied all 3 requested assignments.

292. Defendant also departed from ordinary process: no IDP meeting for 10 months before the letter; reassignment and removal-level discipline without notice or hearing; locked folders while she was faulted for missing records; and shifting attributions of the 2026 rating debacle.

293. The documented knowledge, timing, escalation, coordination, selective enforcement, and shifting explanations support the inference that Zhang's protected activity was a motivating factor in, and a but-for cause of, the adverse actions.

***D. Independent Statutory Basis, Exhaustion, and Continuing Injury***

294. This Count stands independently of the First Amendment count (Count I) and the Fifth Amendment count (Count II). It seeks relief for actions taken because Zhang opposed discrimination and participated in EEO proceedings. It requires no showing of public concern, citizen speech, or structural defect.

295. Professor Zhang exhausted administrative remedies through her EEO complaints, amendments, and proceedings. Later acts arose from, or are reasonably related to, matters under administrative review, and she amended her complaint to include the December 2025 non-selection. Those acts form part of a continuing retaliatory course.

296. The counseling letter remains unrescinded and will be considered in future appraisals and promotion decisions. The investigation has never been closed. The student-contact restriction persists. Her within-grade step increases for 2024 and 2026 have not been paid.

297. Professor Zhang has suffered financial loss, impaired advancement, reputational harm, significant emotional distress and deterioration in her health, loss of professional duties, and continuing exposure to discipline.

**COUNT V**

**HOSTILE WORK ENVIRONMENT**

298. Professor Zhang incorporates each preceding allegation.

299. Throughout this period, Professor Zhang worked under every act above: the disparaging remarks, the doubled teaching load not imposed on a white male colleague with comparable capability, 7 rejections, exclusion from meetings her white male colleagues attended, the "unethical" label, the rescinded award, the stigmatizing mental-health references, and a removal-level letter. Against the backdrop of these acts, the recurring conduct culminating in the counseling letter, formed a hostile work environment.

300. Professor Zhang, a Chinese American female, was subjected to unwelcome conduct based on her sex, race, and national origin. The conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

301. The hostile conduct included discriminatory remarks and treatment:

302. Racial and ethnic targeting: Dean of UKP repeatedly instructed Zhang to "go back to Chinese school" based on her national origin and ethnicity.

303. Gender-based disparagement: Senior administrators referred to female faculty as "a stable of teachers" and made stereotypical comments about women and minorities.

304. Race- and sex-based exclusion: Senior administrators admitted that "all leaders at DLI are old white male."

305. Public humiliation: Dean publicly labeled Zhang "unethical" without basis after she reported institutional misconduct.

306. The harassment escalated systematically from 2023 through 2026, including:

- Professional isolation: Systematic exclusion from meetings, communications, and institutional decision-making processes.

- Discriminatory work assignments: Forced dual teaching load not imposed on similarly situated male colleagues.
- Reputational attacks: Public and private disparagement designed to undermine Zhang's professional standing. The Chief of Staff disclosed her reporting to the officials she had reported. Dean's email repeated stigmatizing mental-health references to administrators and colleagues.
- January 2025 Award rescission: Removal of earned recognition creating stigmatization among peers.
- Student contact prohibition

307. By contrast, white male colleagues such as the white male Specialist were shielded from accountability for documented misconduct and received favorable treatment, demonstrating that the hostile treatment was based on Zhang's protected characteristics.

308. Supervisors and senior administrators carried out the hostile conduct: Dean, the Associate Provost, the Chief of Staff, and Supervisor. Each controlled Zhang's workload, discipline, evaluations, or career. Harassment by officials with that authority carries implicit coercion and threatens tangible employment consequences.

309. The hostility was carried out through formal management instruments: the counseling letter, the January award rescission, impossible and contradictory directives, investigative manipulation, and locked advising folders that made compliance impossible. Hostility embedded in official processes and records alters the conditions of employment and permanently affects reputation and advancement.

310. The conduct included non-discrete, recurring acts: repeated remarks, mandatory biweekly meetings alone with the white male colleague she had reported, heightened monitoring of her work, professional isolation, and repeated stigmatizing mental-health references, including those in the counseling letter and Dean's threat of a police welfare check during the October furlough.

311. Dean denied Zhang access to core work functions through the student-contact prohibition. Defendant locked the advising folders she needed to do her work. The Deputy

Dean opened an investigation of Zhang on anonymous comments preferring non-AI study strategies, despite overall positive feedback, while the Commandant publicly encouraged AI use. The white male Specialist's admitted failures to upload reports, follow the curriculum, and keep the tracker produced no investigation.

312. The hostility escalated after rounds of protected activity, with January award rescission, sudden discipline, impossible assignments, and intensified scrutiny.

313. Professor Zhang reported the conduct repeatedly. No corrective action followed. Senior administrators instead participated in or ratified the conduct.

314. Senior administrators labeled Zhang "unethical" and placed stigmatizing mental-health references in official records without process, impairing her professional standing and future employment prospects.

315. The conduct culminated in tangible employment actions, including disciplinary measures and explicit removal threats in Zhang's first counseling letter in 23 years of service. The counseling letter was both a discrete adverse action and the culmination of this course of conduct. The letter's charges rested on the same coordination directives, biweekly meetings, and folder requirements. Zhang raised the letter with the EEO office on October 3, 2025, 24 days after it issued.

316. This pattern of harassment was both subjectively and objectively hostile. The conduct was frequent, recurring from 2023 into 2026; humiliating, including the "unethical" label and stigmatizing mental-health references sent to colleagues; threatening, including a police welfare check and removal threats; and it interfered with her work by removing student contact and locking the folders she needed. Zhang contemporaneously reported the conduct to supervisors and EEO officials. A reasonable person in Zhang's circumstances would find the environment abusive.

317. As a direct result of this hostile environment, Zhang has suffered significant emotional distress and deterioration in her health.

318. The conduct is imputable to Defendant because it was perpetrated by supervisors with authority over Zhang and resulted in tangible adverse employment actions.

319. Defendant's shifting and inconsistent explanations for the challenged conduct support the inference that it was based on Zhang's protected characteristics.

320. The harassment was directly tied to Zhang's protected characteristics and her engagement in protected EEO activity, creating an atmosphere designed to intimidate.

321. In August 2026, Defendant transferred the white male Specialist from URU. No replacement designated Student Learning Specialist was assigned. Zhang became the sole designated Student Learning Specialist for all five URU departments. Zhang's caseload expanded to approximately 460 to 480 students across approximately 30 instructional teams, about 3 to 5 times the caseload of the white male Specialist in his new post with the same title. This occurred after Zhang had reported the conduct described above and while her EEO complaints remained pending.

322. Leadership then restored the standardized tracking system Zhang had previously developed and proposed. Administrators had previously rejected that system. On August 6, 2026, leadership also reaffirmed institutional use of the standard English Grammar and Learning Strategies curricula Zhang had followed throughout. Neither restoration was accompanied by withdrawal of the counseling letter, correction of the appraisal, or normalization of Zhang's workload.

323. Dean publicly recognized two collateral-duty faculty members for advising support. Zhang was not mentioned. Zhang carried the larger caseload as the sole designated specialist, supporting approximately 30 instructional teams and 460–480 students, the largest SLS caseload by a single specialist at DLI.

324. The current Assistant Commandant received the Chief of Staff's August 20, 2025 disclosure of Zhang's whistleblower identity. No corrective action followed that disclosure. After Zhang reported to the Commandant, Defendant modified the open-door policy to require routing of grievances through the Assistant Commandant before reaching the Commandant. Zhang had previously communicated directly with the Commandant regarding the conduct described herein on two occasions.

325. In September and October 2026, following the white male Specialist's transfer, Dean imposed three new requirements on Zhang: submission of her students' names for her appraisal and tracking of every future advisee, immediate student feedback after each instructional session, and student signatures on every advising report. The standard advising form does not contain that field. Dean imposed these requirements on top of the largest SLS caseload at DLI. These requirements were never imposed while the white male Specialist held the position. They remain in effect.

**COUNT VI**

**VIOLATION OF THE PRIVACY ACT, 5 U.S.C. §§ 552A(B), (G)(1)(D)**

**Four Unauthorized Disclosures**

326. Professor Zhang incorporates the preceding factual allegations by reference.

327. Defendant maintains systems of records retrieved by Professor Zhang's name, including her EEO complaint and mediation records under EEOC/GOVT-1 and her performance appraisals under OPM/GOVT-2. Defendant's officials retrieved and disclosed these records without her written consent. Each disclosure followed her protected activity. Disclosures 2 through 4 went to officials who then took part in adverse actions against her.

328. This Court has jurisdiction under 5 U.S.C. § 552a(g)(1), which waives sovereign immunity for this claim.

***Disclosure 1 — April 24, 2024, Confidential Mediation Records***

329. Professor Zhang participated in EEO mediation under confidentiality protections. Defendant retrieved her mediation communications from her EEO case records and released them to the ROI investigator without notice or consent. The disclosure made her appear uncooperative before the EEOC Administrative Judge.

330. No routine use applies, and the ROI investigator had no need to know mediation communications kept confidential under 5 U.S.C. § 574. Defendant disclosed them deliberately, for an adversarial purpose, and the disclosure damaged Professor Zhang's professional reputation.

***Disclosure 2 — December 31, 2024, EEO Complaint Records***

331. Agency Counsel retrieved Professor Zhang's EEO file, characterized her as "using EEO as a mechanism," urged leadership to "mitigate," and disclosed to senior officials outside the processing of her complaints that Zhang had pending EEO complaints. Professor Zhang did not consent.

332. No need-to-know exception applies. The recipients had no role in processing her EEO complaint, and they later took part in adverse actions against her. Counsel disseminated Professor Zhang's EEO status in detail to senior administrators. Professor Zhang protested. Defendant neither rescinded the instruction nor corrected the disclosure.

333. The disclosure caused adverse actions by the informed administrators. Within 30 days, Defendant rescinded Professor Zhang's publicly announced quarterly award, which carries monetary value in merit-pay and within-grade step increase decisions. Position denials, restrictions, and removal-level discipline followed.

***Disclosure 3 — Associate Provost to Chief of Staff and the Provost (disclosed in sworn testimony recorded April 1, 2025)***

334. The Associate Provost disclosed Professor Zhang's EEO status, drawn from the record Counsel had disclosed to him, to the Chief of Staff and the Provost without her consent. Both were outside her academic supervisory chain and had no need for the record.

335. The Chief of Staff later transmitted her reporting status to the administrators implicated in her complaints. That chain of disclosure led to the student-contact restriction, the counseling letter, and the lost within-grade step increase.

***Disclosure 4 — August 20, 2025, Performance Appraisal and Whistleblower Report***

336. Professor Zhang reported misconduct to the Chief of Staff, who requested her performance appraisal, a record maintained under OPM/GOVT-2. Within 20 minutes of receiving it on August 20, the Chief of Staff forwarded her report to the Dean and the Associate Provost, the officials whose conduct she had reported, and to the Provost, copying the Assistant Commandant, and exposed her as the reporting employee. Professor Zhang did not consent.

337. No need-to-know exception applies. Sending her report to its subjects served no performance-management duty. Defendant restricted her student contact, opened an investigation, and issued removal-level discipline.

338. Willfulness, Adverse Effects, and Actual Damages

339. The disclosures were intentional or willful. Named officials retrieved Professor Zhang's records and sent them, over her objection, to recipients that included officials implicated in her complaints. Four disclosures over 16 months, each following protected activity, show one course of conduct, carried out through Counsel rather than internal processing and coordinated among senior officials.

340. The full scope of dissemination is known only to Defendant. Dissemination has continued under Counsel's unrescinded instruction.

341. The disclosures caused adverse effects, including reputational stigma, humiliation, damage to professional standing, exclusion from duties and meetings, restrictions on academic duties, and disciplinary consequences.

342. The disclosures also caused pecuniary loss, including the rescinded award, denied positions, lost compensation and benefits, and the lost within-grade step increases. These are actual damages under 5 U.S.C. § 552a(g)(4).

**PRAYER FOR RELIEF**

Professor Zhang seeks declaratory and prospective injunctive relief against Defendant in his official capacity on her constitutional claims, under 5 U.S.C. § 702. She seeks monetary relief only under Title VII and the Privacy Act.

Professor Zhang respectfully requests that this Court enter judgment in her favor and grant the following relief:

A. Declare that Defendant's actions described herein violated Professor Zhang's rights under the First and Fifth Amendments to the United States Constitution and Title VII of the Civil Rights Act of 1964, and that Defendant is liable under the Privacy Act of 1974.

B. Enjoin Defendant from imposing or enforcing disciplinary action, including reliance on the September 9, 2025 counseling letter, in retaliation for Professor Zhang's constitutionally protected speech or protected EEO activity.

C. Enjoin Defendant from undertaking retaliatory removal, reassignment, discriminatory workload assignments, or other adverse personnel actions, including the dual teaching requirement, based on Professor Zhang's protected speech or protected EEO activity.

D. Order Defendant to restore Professor Zhang's full access to student advising, teaching, and core job duties, including rescission of the August 21, 2025 prohibition on student contact.

E. Order rescission of the September 9, 2025 counseling letter and its expungement from all personnel files or, in the alternative, order Defendant to provide the particulars of the charges and a meaningful opportunity to respond. Order Defendant to give Professor Zhang written notice that the related investigation is closed.

F. Order corrective relief for retaliatory and discriminatory personnel actions, including correction of unlawfully altered performance appraisals, restoration of improperly denied awards and employment opportunities, and restoration of Professor Zhang to the position she would have occupied absent unlawful discrimination and retaliation.

G. Order correction of inaccurate TDA designations and a meaningful opportunity to contest the operative records relied upon in decisions affecting Professor Zhang's specialist position.

H. Order review of the student-contact restriction, the investigation, the counseling letter, and the altered appraisal by officials whose conduct is not at issue.

I. Order retrieval of the February 7 material or the issuance of authorized handling instructions. Also order written clarification that Professor Zhang's unsolicited receipt of the material will not itself be treated as misconduct.

J. Afford Professor Zhang a meaningful opportunity to clear her name concerning the disseminated stigmatizing accusations.

K. Enjoin further disclosure of Professor Zhang's protected EEO and whistleblower information in retaliation for her protected speech or protected EEO activity, and order corrective measures to prevent further such disclosures, including rescission of Agency Counsel's December 31, 2024 instruction to disseminate.

L. Order appropriate relief for proven discriminatory compensation and workload disparities under Title VII.

M. Order compliance reporting or other measures necessary to enforce any injunctive relief granted.

N. Order Defendant to provide training to leadership and counsel on anti-retaliation, confidentiality, and equal employment obligations.

O. Award back pay, front pay, lost compensation and benefits, including the lost within-grade step increases, and interest under Title VII.

P. Award compensatory damages under Title VII and actual damages under the Privacy Act.

Q. Award costs, and attorney's fees to the extent permitted by law.

R. Grant such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED:** Professor Zhang demands trial by jury on all issues so triable as of right.

**ACCURACY CERTIFICATION**

Plaintiff certifies that, to the extent any content in this filing was generated with the assistance of generative AI tools, Plaintiff has personally verified its accuracy to the best of her knowledge.

Respectfully submitted,

*/s/ Hang Zhang*
Hang Zhang
Dated: November 3, 2026